**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Mallett, Inc., | : | Case No. 21-11619 (JLG) |
| | : | |
| Debtor. | : | |

------------------------------------------------------------x

### MEMORANDUM DECISION AND ORDER GRANTING THE DEBTOR'S LEASE REJECTION MOTION AND CLAIM REDUCTION MOTION

<u>**APPEARANCES**</u> :

BACKENROTH FRANKEL & KRINSKY, LLP
*Counsel for Mallett, Inc.*
800 Third Avenue
New York, New York 10022
By:     Mark A. Frankel


ANSELL GRIMM & AARON, P.C.
*Counsel for 929 Madison Avenue, LLC*
365 Rifle Camp Road
Woodland Park, New Jersey 07424
By:     Anthony J. D'Artiglio
           Joshua S. Bauchner

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[1]

There are two interrelated motions before the Court.  In the Lease Rejection Motion,[2] the Debtor seeks to reject a twenty-five-year Lease of the Landlord's Premises nunc pro tunc to the Petition Date.  The Landlord filed an objection to the motion (the "Lease Rejection Objection")[3] and the Debtor has filed a reply to the objection (the "Lease Rejection Reply").[4]  The Landlord timely filed the Landlord Claim herein.  Pursuant to the Claim Reduction Motion (with the Lease Rejection Motion, the "Motions"),[5] the Debtor seeks to reduce that claim.  The Landlord filed an objection to the motion (the "Claim Reduction Objection"),[6] and the Landlord filed a reply to the objection (the "Claim Reduction Reply").[7]

---

[1]    Capitalized terms that are not defined in the Introduction have the same meanings as those subsequently defined herein.

[2]    *Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Unexpired Lease Rejection Nunc Pro Tunc to the Petition Date, (B) Approving Lease Rejection Procedures, and (C) Authorizing the Abandonment of Certain Property in Connection Therewith, Each Effective Nunc Pro Tunc to the Petition Date, and (D) Granting Related Relief*, ECF No. 5.  References to "ECF No. __" are to documents filed on the electronic docket in this chapter 11 case under Case Number 21-11619.

[3]    *Creditor 929 Madison Avenue, LLC's Memorandum of Law in Opposition to Debtor's Motion (A) Authorizing Unexpired Lease Rejection Nunc pro Tunc to the Petition Date, (B) Approving Lease Rejection Procedures, and (C) Authorizing the Abandonment of Certain Property in Connection Therewith, Each Effective Nunc pro Tunc to the Petition Date, and (D) Granting Related Relief*, ECF No. 18.

[4]    *Reply to Objection*, ECF No. 20 ("Lease Rejection Reply").

[5]    *Motion to Reduce Claim 5 of 929 Madison Avenue LLC*, ECF No. 79.

[6]    *Creditor/Landlord 929 Madison Avenue, LLC's Memorandum of Law in Opposition to Debtor's Motion Objecting to Creditor/Landlord's Claim*, ECF No. 100.

[7]    *Reply to Objection to Motion to Reduce Claim 5*, ECF No. 103.

The Court heard arguments on the Motions.  For the reasons set forth herein, the Court grants the Lease Rejection Motion and the Claim Reduction Motion.  In granting the Lease Rejection Motion, the Court grants retroactive relief, rejecting the Lease *nunc pro tunc* as of the Petition Date.  In granting the Claim Reduction Motion, the Court (i) calculates the statutory cap on lease-rejection damages to be $942,947.52; (ii) determines that the portion of the Landlord Claim for unpaid rent through July of 2021 is $1,295,914.80; (iii) determines that the portions of the Landlord Claim seeking additional compensation for postpetition use of the Premises are impermissible as either an administrative claim or as a general unsecured claim; and (iv) determines that attorneys' fees payable to the Landlord's in-house counsel under the Lease total $77,495.  The Court considers these matters below.

### Background

### March 2002—Debtor Executes Lease with Landlord

The Debtor is an antique dealer who formerly operated a store at 929 Madison Avenue in Manhattan (the "Premises").[8]  In March 2002, the Debtor entered into a twenty-five-year lease (the "Lease") of the Premises with 929 Madison Avenue LLC (the "Landlord").[9]

### January 2016—Debtor Executes Sublease with Subtenant

In 2016, after business had declined, the Debtor closed the store and entered into a sublease of the Premises (the "Sublease") with Stella McCartney, a retail-fashion company (the "Subtenant").  Local Rule Statement ¶ 3.  At some point during the COVID-19 pandemic, the Subtenant stopped paying rent to the Debtor and breached the Sublease.

---

[8]    *Local Rule Statement*, ECF No. 2, ¶ 3.

[9]    The Lease and Amendment to the Lease are annexed to the Landlord Claim as Exhibits B and C, respectively.

**Debtor State Court Action**

On November 13, 2020, the Debtor sued the Subtenant for breach of the Sublease in New York State Supreme Court (the "State Court"), seeking (i) $1,016,756.51 for rent due between April and November 2020, plus statutory interest; (ii) $674,533.67 for a security deposit that the Subtenant failed to replenish, plus statutory interest; (iii) $9,120,420.32 for the present value of rent that would have accrued for the remaining term of the Sublease until its expiration; (iv) attorneys' fees and expenses; and (v) interest to the extent provided by law.[10]

On January 8, 2021, the Subtenant answered the Debtor's complaint, asserted counterclaims against the Debtor, and filed a third-party complaint against the Landlord.  In it, the Subtenant alleged, in part, that the Landlord was an interested and necessary party to the action because its ownership interest in the Premises might be inequitably affected by a judgment in the action.

On April 7, 2021, the Landlord answered the third-party complaint and asserted three counterclaims against the Subtenant.  In support of those claims the Landlord asserted:

> Subtenant had been occupying the Premises without paying any money to the Landlord from April 2020 to the time of filing, and the Landlord was therefore entitled to *quantum meruit* damages of at least $1,538,429.83.

> Subtenant engaged in unjust enrichment at the Landlord's expense by occupying the property without paying the Landlord, entitling the Landlord to damages of at least $1,538,429.83.

> The Landlord had agreed to the Lease and consented to the Sublease in reliance on the promise that the Debtor and the Subtenant would make timely payments without setoff or deduction from the Subtenant's security deposit.  However, the Subtenant's nonpayment forced the Tenant to draw down the deposit, which the Subtenant had not replenished, leaving the security deposit unavailable as a source of recovery for the Landlord—this allegedly constituted another basis for an

---

[10]    *See Complaint, Mallett, Inc. v. Stella McCartney America, Inc.*, No. 656287/2020 (Sup. Ct. Nov. 13, 2020), Doc. 1.

unjust enrichment claim and warranted imposition of a constructive trust on Subtenant's security deposit.

On June 23, 2021, the Debtor filed an amended complaint against the Subtenant, seeking $1,016,756.51 for rent owed from April through November 2020 and $11,587,940.83 in the present value of rent that would have accrued for the remaining term of the Sublease, and for attorneys' fees. The Debtor also sought to recover the Subtenant's $674,533.67 security deposit.

The State Court ordered mediation of the disputes among the parties. The Debtor reached a settlement with the Subtenant, but not with the Landlord. On August 6, 2021, the Debtor and Subtenant entered into an agreement to settle the action (the "Settlement Agreement").[11] Pursuant to the agreement, Subtenant paid $3,250,000 to the Debtor in satisfaction of all Rent (approximately $2,181,806.10) and Additional Rent, as defined in the Sublease. Settlement Agreement at 2. Pursuant to the agreement, and without limitation, (i) the Debtor agreed to discontinue litigation against the Subtenant, (ii) both parties agreed to terminate the Sublease, (iii) the Subtenant agreed to surrender and return vacant possession of the Premises in broom-clean condition, free and clear of any and all personal property and equipment, and with moveable trade fixtures removed and the keys to the Premises to Mallett on or prior to August 10, 2021, and (iv) the Subtenant agreed to remove the signage and awning installed on the front of the building and repair any damage caused to the affected portions of the building by such removal at the Subtenant's sole cost and expense. *Id.* at 2–3.

---

[11]    The Settlement Agreement, which has been sealed, is annexed in redacted form to the D'Artiglio Decl. as Exhibit E.

**Landlord State Court Action**

On December 8, 2020, the Landlord sued the Debtor for breach of contract under the Lease in the State Court (the "Landlord State Court Action").[12]  The Landlord sought, inter alia, a money judgment of at least $728,940.98, as well as the additional amounts that were to come due under the Lease during the period through and including trial.  It also asserted a claim for attorneys' fees under the Lease as a second independent claim.

In July 2021, the Landlord moved the State Court for an order attaching: (i) the $674,533.67 that resulted from the Debtor's draw down of the letter of credit posted by the Subtenant; (ii) all outstanding rent owed by the Subtenant to the Debtor; (iii) damages owed to the Debtor by the Subtenant resulting from the breach and termination of the Sublease; and (iv) the proceeds from certain causes of action asserted by the Debtor in his state case against the Subtenant.[13]  It also sought a preliminary injunction enjoining the Debtor from using any funds received from the Subtenant.  The Debtor opposed the motion.[14]  The State Court determined that the Landlord had failed to demonstrate an entitlement to pre-judgment relief, and denied both the pre-judgment attachment and the preliminary injunction.[15]

---

[12]   *See Complaint*, *929 Madison Avenue LLC v. Mallett, Inc.*, No. 656859/2020 (Sup. Ct. Dec. 8, 2020), Doc. 2.

[13]   *Plaintiff's Memorandum of Law in Support of Its Motion to Compel the Payment of Rent, for Attachment and for a Temporary Restraining Order and Preliminary Injunction*, *929 Madison Avenue LLC v. Mallett, Inc.*, No. 656859/2020 (Sup. Ct. July 2, 2021), Doc. 30 at 1.

[14]   *Memorandum of Law of Defendant Mallett, Inc. in Opposition to Plaintiff's Order to Show Cause*, *929 Madison Avenue LLC v. Mallett, Inc.*, No. 656859/2020 (Sup. Ct. July 14, 2021), Doc. 43.

[15]   *Decision and Order on Motion*, *929 Madison Avenue LLC v. Mallett, Inc.*, No. 656859/2020 (Sup. Ct. July 23, 2021), Doc. 45.

In August 2021, the Landlord moved to reargue its motion for a prejudgment attachment and preliminary injunction.[16]  The trial court denied that motion two days later.[17]  The Debtor did not respond to the motion.

On September 1, 2021, the State Court granted the Landlord's motion for summary judgment against the Debtor.  September 2021 Decision & Order on Motions at 1.[18]  It held that there was "no question of fact that defendant owes plaintiff $1,281,068.45 in unpaid rent."  *Id.* The State Court awarded the Landlord $1,281,068.45 "plus 9% statutory pre-judgment interest from July 30, 2021 to the date judgment is entered."  *Id.*  It severed the issue of attorneys' fees for consideration at a later date.  *Id.* at 2.  On September 15, 2021, the State Court entered judgment, calculating the total amount (including 9% interest) to be $1,295,914.80 (the "State Court Judgment").[19]

### Debtor Purports to Surrender Keys to the Premises to the Landlord

On or about August 31, 2021, the Debtor surrendered the keys to the Premises to the Landlord, but the Landlord returned the keys and refused to accept turnover of the Premises.  Local Rule Statement ¶ 7.

---

[16]  *Plaintiff's Memorandum of Law in Support of Its Motion to Reargue*, *929 Madison Avenue LLC v. Mallett, Inc.*, No. 656859/2020 (Sup. Ct. Aug. 9, 2021), Doc. 109.

[17]  *August 11, 2021 Decision & Order on Motion*, *929 Madison Avenue LLC v. Mallett, Inc.*, No. 656859/2020 (Sup. Ct. Aug. 11, 2021), Doc. 110.

[18]  The State Court's September 2021 Decision & Order on Motions is attached to the D'Artiglio Decl. as Exhibit F.

[19]  The State Court Judgment is attached to the Landlord Claim as Exhibit A.

## The Chapter 11 Case

On September 15, 2021 (the "Petition Date") the Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code.[20]  On September 17, 2021, the Debtor elected to proceed under subchapter V of chapter 11 of the Bankruptcy Code by filing an amended petition for relief (the "Petition").[21]  The Debtor remained in possession and control of its assets pursuant to sections 1107 and 1108 of the Bankruptcy Code.  On or about the Petition Date, Heidi Sorvino, Esq. was appointed Subchapter 5 Trustee.

On the Petition Date, the Debtor moved for an order approving, inter alia, rejection of the Lease nunc pro tunc to the Petition Date, certain lease-rejection procedures, and abandonment of certain property.

On December 8, 2021, the Debtor filed a Plan of Reorganization.[22]

On March 8, 2022, the Debtor filed its First Amended Chapter 11 Plan of Reorganization (the "Plan").[23]

By order dated April 24, 2022, the Court confirmed the Plan.[24]

---

[20]   *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, ECF No. 1.

[21]   *Amended Voluntary Petition for Non-Individuals Filing for Bankruptcy*, ECF No. 7

[22]   *Plan of Reorganization*, ECF No. 28.

[23]   *Debtor's First Amended Chapter 11 Plan of Reorganization Under Subchapter V of the Bankruptcy Code*, ECF No. 50.

[24]   *Findings of Fact, Conclusions of Law, and Order Confirming Debtor's Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11*, ECF No. 66.

**The Landlord's Proof of Claim**

On December 14, 2021, the Landlord timely filed a claim against the Debtor in the sum of $1,498,126.43.  *See* Proof of Claim No. 5-1.  On January 28, 2022, the Landlord filed its second amended proof of claim in the sum of $3,079,296.16 (the "Landlord Claim").[25]  The Landlord's Claim consists of (i) a $1,295,914.80 judgment for unpaid rent and additional rent (excluding attorneys' fees and costs), through the end of July 2021; (ii) $75,427.25 in rent for August 2021; (iii) $3,017.09 in late fees from August 2021; (iv) $91,585.00 in in-house legal fees and costs recoverable pursuant to the Lease; (v) $16,559.14 in outside counsel legal fees and costs recoverable pursuant to the Lease; (vi) a $616,024.84 administrative expense claim; and (vii) $980,768.04 in lease-rejection damages calculated as one year of rent from May 1, 2022, through April 30, 2023.  Landlord Claim, Ex. I.

## Motions

### I.    Lease Rejection Motion

The Debtor contends that on August 31, 2021, it relinquished control of and surrendered the Premises to the Landlord.  It explains that, in an abundance of caution, it seeks authorization to reject the Lease effective *nunc pro tunc* to the Petition Date, and to abandon any remaining personal property located at the Premises of the Rejected Lease, effective *nunc pro tunc* to the Petition Date.  Lease Rejection Motion ¶ 15.

The Landlord opposed the motion.  The Landlord asserts that the Debtor's request to reject the Lease is premature and procedurally defective.  Lease Rejection Objection at 9–11.  It says that the application is devoid of any detail or evidence supporting the Debtor's position that rejecting

---

[25]    The Landlord Claim is part of the Court's Claims Register as Claim No. 5-3.

the Lease is in the best interest of the bankruptcy estate.  *Id.* at 11.  Moreover, it contends that the Court should reject the Debtor's attempt to reject the Lease *nunc pro tunc* and deny the Landlord an otherwise permitted administrative expense claim.  *Id.* at 12.  It argues that it would be inequitable to permit Debtor to reject the Lease as the estate is deriving a benefit from the continued Lease term without just compensation to the Landlord.  The Landlord asserts that Debtor's $13,279,231.01 claim against Subtenant under the Sublease includes $1,016,756.51 for unpaid rent through November 2020, $674,533.67 for replenishment of the security deposit, and $11,587,940.83 for future rent and additional rent due under the Sublease.  *See* D'Artiglio Decl., Exhibit A.[26]  It maintains that the settlement payment totaling $3,250,000.00 necessarily includes amounts due under the Sublease for periods of time after September 2021.  Lease Rejection Objection at 9.  It argues that the Debtor would be entitled to those funds to the extent that it would have been able to furnish the property pursuant to the Sublease after September 2021.  *Id.*  It asserts that it would be inequitable for the Debtor's general unsecured creditors (many of whom are insiders) to benefit from the proceeds of the Settlement Agreement premised on the Debtor's continued ability to furnish the Premises, while simultaneously permitting the Debtor to reject the Lease and pay Landlord nothing for the periods of prospective Lease term captured within the settlement payment.  Thus, it contends that the Debtor should not be permitted to reject the Lease as of September 15, 2021.

The Court considers those matters below.

---

[26]    *Declaration of Anthony J. D'Artiglio, Esq.*, ECF No. 100-2 ("D'Artiglio Decl.").

### *Whether the Debtor Terminated the Lease Prepetition*

The Debtor asserts that the Lease Rejection Motion may be unnecessary because it terminated the Lease on August 31, 2021, when it vacated the Premises and attempted to surrender the Premises to the Landlord.  Lease Rejection Motion ¶ 14.  The Landlord denies that contention.

The Court looks to state law to determine whether a lease has been terminated prepetition. *See Super Nova 330 LLC v. Gazes*, 693 F.3d 138, 143 (2d Cir. 2012).  In New York, the right to terminate a commercial lease is generally governed by the provisions of the lease.  *See, e.g.*, *Roy, Gene & Ron Kahn v. Taco Bell Corp.*, No. 92-cv-6304, 1993 WL 313055 (S.D.N.Y. Aug. 3, 1993). The Debtor vacated the Premises and attempted to surrender the Premises to the Landlord by delivering the keys to it.  The Landlord rejected the keys and Debtor's attempted surrender of the Premises.  However, the Lease does not afford the Debtor a unilateral right of termination.  Article 19(b) of the Lease grants that right exclusively to the Landlord.  Lease at 19–20.  Accordingly, under New York law and the terms of the contract, the Debtor did not terminate the Lease on August 31, 2021.  *See, e.g.*, *Nationwide Life Ins. Co. v. A.L. Holdings, Inc.*, No. 18-cv-10435, 2019 WL 4382202 (S.D.N.Y. Aug. 21, 2019) (applying the terms of a commercial lease to resolve a dispute over the landlord's termination of the lease after the tenant's default); *see also W.F.M. Rest., Inc. v. Austern*, 35 N.Y.2d 610 (1974) (following the dismissal of the tenant's bankruptcy, a landlord was permitted to terminate a commercial lease upon the filing of a bankruptcy petition only under an express clause in the lease).

The Debtor argues that, even if the Landlord has the right to refuse surrender and lease termination under New York law, "surrender was complete [and] the Lease terminated under the Bankruptcy Code."  Claim Reduction Reply ¶ 17 (citing *In re MDC Sys., Inc.*, 488 B.R. 74, 85 (Bankr. E.D. Pa. 2013); *In re Flanigan*, 374 B.R. 568, 577–78 (Bankr. W.D. Pa. 2007)).

The cases cited by the Debtor stand for the proposition that, in calculating the section 502 cap on damages for future rent owed under a breached lease, bankruptcy courts begin the capped period at the earlier of the petition date or the date of termination.  In particular, those cases clarify that the section 502 reference to "termination" includes a lessee's unsuccessful attempt to surrender the leased premises—even if the attempted surrender was insufficient under governing state law to effect a termination of the lease.  *See In re MDC Sys., Inc.*, 488 B.R. at 85; *In re Flanigan*, 374 B.R. at 577–78.  However, they do not stand for the proposition that section 502 (or any other provision of the Bankruptcy Code) supersedes state-law requirements for lease termination—they refer only to the date with which a bankruptcy court begins its calculation of damages under section 502 of the Bankruptcy Code.  To the extent that the Debtor relies on *Flanigan* and *MDC Sys.* for the proposition that section 502 obviates the need for the Court to consider its Rejection Argument, the Court disagrees.

### Whether the Debtor Has Established Grounds to Reject the Lease

"Section 365(a) of the Bankruptcy Code provides that a debtor in possession 'subject to the court's approval, may assume or reject any . . . executory contract or unexpired lease of the debtor.'" *In re Celsius Network LLC*, No. 22-10964, 2022 WL 14193879, at *7 (Bankr. S.D.N.Y. Oct. 24, 2022) (quoting 11 U.S.C. § 365(a)).  "The purpose behind Section 365(a) is 'to permit the trustee or debtor-in-possession to use valuable property of the estate and to renounce title to and abandon burdensome property.'" *In re Republic Airways Holdings Inc.*, 547 B.R. 578, 582 (Bankr. S.D.N.Y. 2016) (quoting *Orion Pictures Corp. v. Showtime Networks (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993)).

Courts approve the rejection of an executory contract "upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business

judgment." *In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that section 365 is traditionally subject to the "business judgment" standard); *In re Orion Pictures Corp.*, 4 F.3d at 1098–99 (stating that section 365 "permits the trustee or debtor-in-possession, subject to the approval of the bankruptcy court, to go through the inventory of executory contracts of the debtor and decide which ones it would be beneficial to adhere to and which ones it would be beneficial to reject"); *In re Gucci*, 193 B.R. 411, 415 (S.D.N.Y. 1996) ("A bankruptcy court reviewing a trustee's decision to assume or reject an executory contract should apply its 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.").

"In most cases, a court 'will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate.'" *In re Avianca Holdings S.A.*, 618 B.R. 684, 698 (Bankr. S.D.N.Y. 2020) (quoting *In re MF Glob. Holdings Ltd.*, 466 B.R. at 242); *see In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (Bankr. S.D.N.Y. 1986) ("[T]he Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions."); *In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005) ("A court 'should defer to a debtor's decision that rejection of a contract would be advantageous.'" (quoting *In re Sundial Asphalt Co.*, 147 B.R. 72, 84 (E.D.N.Y. 1992))); *Phar-Mor, Inc. v. Strouss Bldg. Assocs.*, 204 B.R. 948, 951–52 (Bankr. N.D. Ohio 1997) ("Whether an executory contract is 'favorable' or 'unfavorable' is left to the sound business judgment of the debtor.  Courts should generally defer to debtor's decision whether to reject an executory contract." (citations omitted)).

Under the "business judgment" test, a debtor must simply put forth a showing that assumption or rejection of the executory contract or unexpired lease will benefit the Debtor's

13

estate.  *See In re MF Glob. Holdings Ltd.*, 466 B.R. at 242; *see also Bregman v. Meehan (In re Meehan)*, 59 B.R. 380, 385 (E.D.N.Y. 1986) ("The primary issue under the business judgment test is whether rejection of the contract would benefit general unsecured creditors."); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must 'establish that rejection will benefit the estate.'" (quoting *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002))).  A debtor can satisfy the "business judgment" test by demonstrating that the contract is no longer beneficial or necessary to the estates, that it has become burdensome to the estates, or that a prompt elimination of the attendant expenses will positively impact the Debtors' ability to improve their financial condition.  *In re MF Glob. Holdings Ltd.*, 466 B.R. at 242; *see In re Riodizio, Inc.*, 204 B.R. 417, 425 (Bankr. S.D.N.Y. 1997) (noting that, in this Circuit, proper business reasons for rejecting a contract include: (i) the contract is uneconomical to complete according to its terms, (ii) the contract is financially burdensome to the estate, and (iii) rejection will result in a large claim against the estate).  To summarize, the Court need only determine that rejection of the contract will benefit the estate.  *See Control Data Corp. v. Zelman (In re Minges)*, 602 F.2d 38, 41 (2d Cir. 1979); *In re G Survivor Corp.*, 171 B.R. 755, 758 (Bankr. S.D.N.Y. 1994), *aff'd*, 187 B.R. 111 (S.D.N.Y. 1995).  Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment will not be altered.  *Id.*, 171 B.R. at 757.

The Landlord contends that there are significant questions as to whether the Debtor was actually insolvent on the Petition Date.  Lease Rejection Objection at 5–7.  However, the undisputed evidence in the record reflects that the Debtor's assets consist of the settlement proceeds received from the Subtenant.  The Landlord Claim totals $3,079,296.16, and the Petition lists general unsecured claims (excluding the Landlord Claim) aggregating more than $10,000,000.

14

Thus, the Landlord's questions as to whether the Debtor is insolvent appear to have been answered by the subsequent developments in this case.

The Landlord contended that it was premature to reject the Lease because the Debtor had relied only on its asserted review of the Lease's market value, which was not presented in a declaration format. *Id.* at 11. However, in its Lease Rejection Reply, the Debtor asserted that it had retained CBRE, "a large real estate services provider to manage the Premises." Lease Rejection Reply ¶ 9. CBRE represented to the Debtor that, before the COVID-19 pandemic, "the area surrounding the Premises was struggling," and the pandemic exacerbated that trend, resulting in high vacancy rates and lowered rents. *Id.* ¶ 10. Thus, the Lease was not marketable due to a combination of this economic environment and the relatively short term that was left on the Lease, according to the Debtor's landlord-tenant counsel. *Id.* ¶ 11. This inability to market the Lease is evidenced by the Subtenant's "similar inability to find a replacement sublessor." *Id.* ¶ 12. This further detail, combined with the reasons articulated in the Lease Rejection Motion, is sufficient to satisfy the business-judgment standard. *See Bildisco*, 465 U.S. at 523.

### *Whether the Lease Rejection Should Be Effective Nunc Pro Tunc to the Petition Date*

"[W]hen the equities [so] demand," a bankruptcy court may grant a motion to reject an executory contract *nunc pro tunc* to a date before which a party against whom relief is sought can file an objection. *BP Energy Company v. Bethlehem Steel Corp. (In re Bethlehem Steel Corp.)*, No. 01-cv-6419, 2002 WL 31548723, at *4 (S.D.N.Y. Nov. 15, 2002) (citing *In re New Valley Corp*, No. 98-982, 2000 U.S. Dist. LEXIS 12663, at *44–46 (D.N.J. Aug. 31, 2001)); *accord In re CCI Wireless,* LLC, 279 B.R. 590, 595 (Bankr. D. Colo. 2002) (approving rejection of non-residential lease retroactive to date of motion to reject); *In re Thinking Machs. Corp.*, 67 F.3d 1021, 1029 n.9 (1st Cir. 1995) (refusing to limit circumstances that justify retroactive rejections).

The equities may favor retroactive rejection where a landlord fails to mitigate its damages. *See Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 607–09 (2d Cir. 2007) (finding that an order allowing retroactive rejection of unexpired commercial lease was not an abuse of discretion where a landlord failed to mitigate damages).  A debtor's decision to vacate provides a landlord with the opportunity to relet the premises and thereby mitigate its risk.  *Id.* at 608–09.  Thus, a debtor's decision to vacate "weighs in favor of granting retroactive relief."  *Id.* at 609.

A bankruptcy court's consideration of the equities may also include "the costs that a delayed rejection date would otherwise impose on a debtor and the timing of the debtor's surrender of leased premises."  *In re SVB Fin. Grp.*, No. 23-10367, 2023 WL 3513360, at *4 (Bankr. S.D.N.Y. May 17, 2023) (citing *Constant Ltd. P'ship(In re Jamesway Corp.)*, 179 B.R. 33, 38 (S.D.N.Y. 1995); *Adelphia*, 482 F.3d at 608–09).  For example, the equities may favor the retroactive rejection of a lease when the landlord is not harmed by the rejection, where the premises have been clearly surrendered, and where landlord has been given notice through the filing of the rejection motion such that the landlord can prepare for the rejection and begin to mitigate its losses. *Id.*

The Landlord concedes that a bankruptcy court may assign a retroactive rejection date under section 365(a) when the principles of equity permit such rejection.  Lease Rejection Objection at 12 (citing *BP Energy Co.*, 2002 WL 31548723 (S.D.N.Y. Nov. 15, 2002); *In re Jamesway Corp.*, 179 B.R. at 39).  However, it contends that the Debtor has not set forth a compelling reason why the Lease should be rejected *nunc pro tunc* to the Petition Date.  *Id.*  It says that equity weighs against such a rejection because "the portion of the settlement payment premised on yet to occur lease term was only possible because of the continued term afforded to

Debtor pursuant to the Lease," and because "questions remain as to whether [the Subtenant] has abandoned the property," whose "signage . . . indisputably remains." *Id.* at 13–14.

The Debtor asserts that the terms of the settlement were confidential, and it is therefore precluded from explaining them. *Id.* ¶¶ 13–14. It contends that the Subtenant has abandoned the Premises, and that the Subtenant's attempt to remove its signage was prevented by the Landlord's demand "that work cease." Lease Rejection Reply ¶ 15.

Equity weighs in favor of granting the Lease Rejection Motion retroactive to the Petition Date. The Court is persuaded that the Landlord's inaction in the face of the Debtor's attempted surrender of the Premises and its awareness that the Court might rule against it supports retroactive relief. The Landlord was on notice that the Debtor was unable to make commercial use of the Premises at least two weeks before the Petition Date, when the Debtor attempted to surrender the Premises. Likewise, the Landlord recognized the potential for a "remarkable event that the Court [would be] inclined to permit Debtor to reject the Lease." Lease Rejection Objection at 12. It nonetheless decided against attempting to mitigate its damages.

New York law allows, but does not require, a landlord to mitigate its damages upon a tenant's breach of a lease. *Holy Props. Ltd., L.P. v. Kenneth Cole Prods., Inc.*, 661 N.E.2d 694 (N.Y. 1995) (explaining that landlords are not obligated to attempt to relet abandoned premises to minimize damages). However, as the Second Circuit explained in *Adelphia*, the fact that a landlord had no duty to mitigate his losses from the breach of a lease under Missouri law did not affect whether the bankruptcy court could consider whether the landlord could have protected himself by reletting the premises. *Adelphia*, 482 F.3d at 610. Likewise, for over two years, beginning when the Debtor attempted to surrender the keys to the Landlord, the Landlord has sat on its rights. Even after the Debtor moved to reject the lease on the Petition Date, it appears that the Landlord

17

has taken no steps to protect itself other than by arguing that the Court should deny the Lease Rejection Motion and waiting for a decision.[27]   Though the Landlord was under no duty to do anything else, *see Holy Props.*, 661 N.E.2d at 696, equity's concerns are broader than the law's requirements, *cf. Adelphia*, 482 F.3d at 610; *In re Thinking Machs. Corp.*, 67 F.3d at 1029 n.9. And here, given the Debtor's attempt to surrender the Premises, the Landlord's knowing assumption of the risk that the Court might rule in favor of the Debtor, and its refusal to help itself by attempting to mitigate its damages, the equities on this point tip decidedly in favor of the Debtor.[28]

Finally, given that the Landlord was aware that the Premises weas being put to no profitable use since the date of the Debtor's attempted surrender, it would be unfair to burden the Debtor with cost of carrying the unproductive property.  *See In re SVB Fin. Grp.*, 2023 WL 3513360, at *4.  The Landlord has long been on notice that the Debtor wishes to reject the lease, such that it had the opportunity to prepare for the rejection and begin to mitigate its losses.  The Landlord chose not to, and it would be inequitable to burden the Debtor with that decision.  *See id.*

---

[27]   The Landlord contended that such relief would be improper until it could investigate the propriety of certain matters bearing on the Debtor's solvency, the Settlement Agreement, and the termination of the Sublease.  It argued that rejection would have been premature given the Landlord's lack of "opportunity to examine Debtor at the meeting of creditors which is set for October 18, 2021" and the "significant questions as to whether Debtor is solvent, improperly settled its claims against [the Subtenant], improperly terminated its sublease with [the Subtenant], or benefitted from a continuing term under the Lease post-Debtor's proposed rejection date."  Lease Rejection Objection at 12.  These matters do not bear on the Court's determination except to the extent that they demonstrate the Landlord's awareness that, if these matters were necessary to determine before the Court should grant the Lease Rejection Motion, that an order granting or denying the motion would not be forthcoming.  Despite that possibility, the Landlord did not take steps to mitigate its damages.

[28]   The Court finds no merit to the Landlord's argument that the Subtenant remains in possession of the Premises because the Subtenant's signage remains thereon.  Even assuming, arguendo, that the Subtenant continued to occupy the Premises, since the Debtor breached the Lease through its nonpayment, *see* State Court Judgment, the Sublease may be terminated by the Landlord's reentry for the Debtor's breach, *Goldcrest Transp., Ltd. v. Across Am. Leasing Corp.*, 748 N.Y.S.2d 411, 413 (App. Div. 2002).

The overall balance of equities weighs in favor of granting retroactive relief, both in light of the Landlord's failure to mitigate its damages and to avoid unfairly apportioning the costs associated with a delayed rejection date to the Debtor.  Because the Debtor has made a showing that rejection of the Lease is a sound business judgment, the Court grants the Lease Rejection Motion.  Moreover, having determined that the equities favor retroactive relief, the Court grants the motion *nunc pro tunc* to the Petition Date.  For the same reasons, the Court overrules the Lease Rejection Objection.

## II.    <u>Claim Reduction Motion</u>

The Landlord Claim primarily consists of six parts.

<u>First</u>: the Landlord seeks $1,295,914.80 for unpaid rent and associated interest, as set forth in the State Court Judgment.

<u>Second</u>: the Landlord seeks rent and late fees for the prepetition month of August 2021.

<u>Third</u>: the Landlord requests additional damages for breach of the Lease, which it asserts amount to $945,889.12 under section 502(b)(6) of the Bankruptcy Code, when measured from the Petition Date.

<u>Fourth</u>: the Landlord seeks an administrative claim $616,024.84 from the Debtor for eight months' use of the Premises by the Subtenant.

<u>Fifth</u>: in the alternative, the Landlord seeks a general unsecured claim in the amount of $616,024.84 on the same theory.

<u>Sixth</u>: the Landlord seeks attorneys' fees in the amount of $108,144.14, consisting of in-house legal fees and costs totaling $91,585 and outside counsel legal fees and costs totaling $16,559.14.

The Debtor seeks to reduce or expunge certain components of the claim.  The Court considers those matters below.

1.      Judgment for Unpaid Rent

On September 15, 2021, the State Court entered the State Court Judgment awarding the Landlord $1,295,914.80, of which $1,281,068.45 represents unpaid rent, and the remaining $14,846.35 corresponds with the statutory 9% interest between July 30, 2021 and entry of judgment. D'Artiglio Decl., Exhibit F at 1. Nonetheless, the Debtor seeks to reduce that claim to "$1,287,051 for pre-lease termination rent." Claim Reduction Motion at 1. The Debtor has failed to advance any reason for doing so. The Court denies the Claim Reduction Motion to the extent the Debtor seeks to reduce this portion of the Landlord Claim.

2.      August 2021 Rent

The Landlord seeks prepetition rent and associated late fees for August 2021 totaling $75,427.25 and $3,017.09, respectively. The Debtor does not challenge this component of the Landlord Claim.

3.      Statutory Cap

The Debtor asserts that, under section 502(b)(6)(A)(ii), the lease-rejection claim is limited to "one year of rent commencing on the Lease termination date." Motion ¶ 16. The Debtor concedes that one year of future rent is due to the Landlord under this provision, "which the Landlord calculates to be $905,124." *Id.* ¶ 18. The Debtor does not explain how it arrived at this figure. [29]

---

[29] Because $905,124 amortized over 12 months results in a rate of $75,427.00 per month, the Court can infer that the Debtor extended the approximate Fall 2022 rate for an additional year, excluding the Lease's six-month incremental rate increases.

The Landlord agrees with the Debtor that it is entitled to one year of rent under section 502(b)(6)(A)(ii).  Claim Reduction Objection at 8.  It arrives at a higher figure for that year, $945,889.12, by totaling four periods of rent at different rates purportedly prescribed by the Lease: "(i) September 2021 stub rent for 16 days totaling $40,227.87; (ii) five months of rent at $75,427.25 through February 28, 2022 totaling $377,136.25; (iii) six months of rent at $81,730.67 through August 31, 2022 totaling $490,384.02; and (iv) September 2022 stub rent 14 days totaling $38,140.98." *Id.*

In a footnote, the Landlord essentially points out that calculation of the amount of lease-rejection damages is contingent on whether the Lease terminated on August 31, 2021, or whether it remained intact until the Petition Date, September 15, 2021.  Claim Reduction Objection at 8 n.3.  Consistent with its Lease Rejection Objection,[30] the Landlord asserts that the Debtor's purported surrender did not terminate the Lease.  *See id.*  Alternatively, it contends that if the Lease were validly terminated on August 31, 2021, the calculation would begin as of that date, encompassing an evenly divided first six months of rent at $75,527.25 and subsequent six months at $81,730.67.  This totals $942,947.52.

As aforementioned, *Flanigan* and *MDC Sys.* do not stand for the proposition that a unilaterally rejected lease is completely terminated by operation of section 502, but they do bear on the calculation of the statutory cap for damages as a result of lease rejection.[31]  Specifically,

---

[30]   The Landlord's arrival at $945,889.12 assumes a Lease termination date of September 15, 2021.  *See Claim Reduction Objection* at 8.

[31]   In *MDC Sys.*, a tenant attempted to terminate a lease prepetition by surrendering the premises to the landlord, which the landlord argued was invalid under Pennsylvania law because the landlord did not mutually agree to the surrender.  *In re MDC Sys., Inc.*, 488 B.R. at 84–85.  The bankruptcy court decided that, for the purpose of calculating the rent reserved under section 502(b)(6)(A), which holds that the rent reserved under the remaining time left on a terminated lease is calculated beginning with the earlier of the petition date or the date of a surrender, the term "surrender" is not identical to the meaning of that term under state law.  *Id.* at 86–87.  The court reasoned in part that,

they require that a court begin the section 502 calculation on the earlier of the petition date or the date on which the lessee attempted to surrender the premises.

As the Debtor notes, this Court has applied *Flanigan* on at least one occasion.[32] In *In re Cortlandt Liquidating LLC*, certain debtor entities filed for bankruptcy in September 2020. *Cortlandt* Order at 1. A non-debtor affiliate of those entities was a tenant of a property it had leased through January 2032, which it vacated in December 2020, returning the keys to the landlord in January 2021, which the tenant argued constituted a turnover. *Id.* at 2. Three days before the tenant left the property, in response to an inquiry about a turnover, the landlord advised the tenant via email that it did not accept surrender or turnover of the property. *Id.* The landlord filed a proof of claim against a debtor for, inter alia, an administrative claim for post-petition rent into December 2020, and a general unsecured claim for rent for the remaining term of the lease. *Id.* The landlord argued that the section 502(b)(6) cap should not apply to its general unsecured claim because the lease had not been validly terminated under state law. *Id.* at 8–9. The Court

---

if the state-law definition were used, it would give rise to an absurdity—a valid surrender under state law would necessarily end any continuing obligation by the tenant for future rent, which would extinguish the landlord's claim for future rent entirely, rendering section 502(b)(6)(A) superfluous. *Id.* Accordingly, the court held that "a surrender under 11 U.S.C. § 502(b)(6) occurs when a tenant vacates and the landlord takes possession [of] the leased premises." *Id.* at 87.

In *Flanigan*, a landlord asserted that the chapter 11 debtors' guaranty obligations under a ten-year lease of a commercial premises, which began in 2003, were continuing past the 2006 petition date. *Flanigan*, 374 B.R. at 571. The business at the premises had closed a prior to the petition date (apparently in late 2005). *Id.* at 571–72. The landlord never accepted a surrender of the premises (it is unclear whether a surrender was even attempted), and so it argued that the lease had not terminated. *Id.* at 572. Like in *MDC Sys.*, the *Flanigan* court reasoned that, for the purposes of performing a section 502(b)(6) calculation, that statute's reference to a termination of the leased property refers to the rejection of a lease by the debtor, irrespective of any state-law requirement that the landlord accept the rejection to effect a termination, since a bankruptcy court's adherence to the state-law requirement would allow landlords to "always avoid the damages cap in § 502(b)(6) by simply not 'terminating' the lease if and when a lease is rejected." *Id.* at 577. The court held that the underlying lease was "functionally dead," and so the landlord's guaranty claim arose "out of termination of the leasehold regardless of whether the underlying lease has been technically terminated for purposes of state law," and that claim was therefore subject to the section 502(b)(6) cap.

[32]    *See Interim Order Granting, in Part, and Denying in Part, Plan Administrator's Objection to Proof of Claim Numbers 1268 and 1443*, *In re Cortlandt Liquidating LLC*, No. 20-12097 (Bankr. S.D.N.Y. May 20, 2022), ECF No. 1260 ("*Cortlandt* Order").

22

rejected that argument, recognizing that "termination under section 502(b)(6) may in fact include circumstances where a lease is 'functionally dead,' such as circumstances where there is an uncured breach of a lease coupled with an intentional abandonment of the premises to the landlord, similar to rejection." *Id.* at 10 (quoting *In re Flanigan*, 374 B.R. at 576–78). Likewise, the Court noted that "it would be antithetical to the purpose of section 502(b)(6) to permit a landlord claimant to avoid the section 502(b)(6) damages cap by simply declining to (a) terminate the lease at issue or (b) accept the lessee's surrender of the premises after the lessee has intentionally abandoned the premises (such that, based on the parties' actions, the lease would be deemed terminated under state law)." Accordingly, the Court held that the lease was "functionally dead" as of the December 7, 2020 vacatur of the premises. *Id.* at 12.

Here, the Court is faced with a similar situation. It is undisputed that the Debtor attempted to return the keys to the Landlord on August 31, 2021, and that the Landlord did not assent to any turnover, rejection, or termination of the Lease. For the purposes of determining whether the section 502 cap applies to the Landlord's claim for rent after that date and post-petition, and for calculating the amount of such cap, the references to a lease termination via surrender in section 502 do not have the same meaning as under state law. Instead, whether a "lessee surrendered . . . the leased property," under section 502 is gauged by the actions of the debtor lessee. 11 U.S.C. § 502(b)(6); *see Cortlandt* Order at 12–13; *Flanigan*, 374 B.R. at 577; *MDC Sys.*, 488 B.R. at 87. Here, the unrefuted evidence shows that at the time of the attempted surrender, the Debtor had not occupied the space for years, the Subtenant had vacated the space,[33]

---

[33]    The Court is unpersuaded by the Landlord's arguments that the Debtor's occupancy persisted beyond the turnover because it continued to enjoy benefits from use of the Premises. The Debtor asserts that the amount of a settlement payment from the Subtenant to the Debtor contemplated post-petition occupancy of the Premises by the Subtenant. The Debtor says that the Subtenant's failure to remove signage evidences such occupancy. As discussed in greater detail below, the Court rejects any argument that occupancy of the Premises persisted beyond August 31, 2021.

and the Debtor intended to terminate the Lease. Thus, there was "an uncured breach of a lease coupled with an intentional abandonment of the premises to the landlord, similar to rejection." *Cortlandt* Order at 11.

As described above, the Court holds that, for purposes of fixing the cap under section 506, the Lease is adjudged to be terminated as of August 31, 2021. The lease-rejection claim should be calculated from that date.[34]    Accordingly, the Court determines that the Landlord is owed lease-rejection damages in the amount of $942,947.52.

4.    Administrative-Expense Claim

The Debtor argues that the Landlord's demand for priority entitlement to the Subtenant's settlement proceeds is not supported by either the Lease or any legal authority, as exemplified by the pre-petition state-court orders denying attachment. Claim Reduction Motion ¶¶ 25–27. The Landlord's $616,024.84 administrative rent claim is not based on any provision of the Lease or any principle under state or bankruptcy law. *Id.* ¶¶ 25–26.

The Landlord asserts that it is entitled to an administrative-expense claim "either for post-petition, pre-rejection rent or, in the alternative, for post-petition 'bought out' Sublease term." Claim Reduction Objection at 12. It maintains that the Bankruptcy Code requires court approval before a debtor-in-possession may reject a contract or an unexpired lease, and if a debtor receives a benefit from the lease prior to assumption or rejection, then an administrative expense claim may arise. *Id.* Thus, in the absence of an order rejecting the Lease, the Debtor must pay post-petition rent under 11 U.S.C. § 365(d)(3). *Id.* The Landlord agreed to reduce its administrative-expense

---

[34]    As aforementioned, the Debtor does not challenge the portion of the claim for prepetition August 2021 rent. By calculating the lease-rejection claim from the August 31, 2021 termination (rather than from September 15, 2021), the $942,947.52 damages accounts for the first two weeks of September 2021. Therefore, there is no gap between the prepetition rent and the post-petition lease-rejection damages.

claim to $616,024.84, i.e., "only 8 months of rent," the period covered by the bought-out Sublease term. *Id.* at 12–13.

Alternatively, the Landlord says that it is also entitled to an administrative-expense claim under 11 U.S.C. § 503(b), "because its furnishing of the [Premises] to the Debtor post-petition allowed Debtor to obtain additional value for the Estate in the form of bought out post-petition Sublease term." *Id.* at 13. The Landlord asserts that, if the Lease were rejected in bankruptcy, the Sublease would automatically be terminated—thus, certain value was added to the Debtor's estate as a result of the continued Lease during bankruptcy. *Id.* at 14. Thus, the bought-out Sublease term entitled the Landlord to an administrative-expense claim of $616,024.84, which would still leave the estate with a sizable profit from the buyout that "can be distributed to unsecured creditors after satisfying Debtor's obligation to the Landlord." *Id.* at 15. The Landlord complains that "to date, neither Debtor nor the Subtenant have obtained the necessary permits to remove the exterior signage from the [Premises]," which impacts the "Landlord's ability to relet the property." *Id.* at 15–16. This is due to the Landlord's asserted view that a potential commercial tenant would incur "an intellectual property infringement claim from [the Subtenant]" if it rented the property. *Id.* at 16. The Landlord asserts that "the Settlement Agreement required removal of the signage." *Id.*

The Debtor, maintains that "nothing in the Lease gives the Landlord an interest in the Debtor's subtenant rental income, nor is the Landlord aware of any principle under New York law or bankruptcy law that supports the Landlord's Claim." Motion ¶ 25. The Landlord asserts that, while its Lease Rejection Motion is pending, "Debtor was and is required to pay post-petition rent pursuant to 11 U.S.C. § 365(d)(3)." Objection at 12. Regardless, it has limited the requested relief to only eight months of rent, to correspond with the Sublease term that was purportedly bought out by the settlement agreement between the Subtenant and the Debtor. *Id.* at 12–13.

The Second Circuit has addressed the issue of administrative-expense claims arising from the rejection of a commercial lease. *Nostas Assocs. v. Costich (In re Klein Sleep Prods.)*, 78 F.3d 18 (2d Cir. 1996). In *In re Klein Sleep Prods.*, a chapter 11 debtor in possession assumed a commercial lease from the debtor with the bankruptcy court's approval, pursuant to 11 U.S.C. § 365. *Id.* at 21. In January 1993, after it became clear that the reorganization had failed, a new Chapter 11 trustee was appointed, who rejected the lease and surrendered possession of the store to the landlord, Nostas. *Id.* Nostas sought, inter alia, administrative expenses in the form of future rent accruing after January 1993. *Id.* The bankruptcy court allowed one year's future rent, as limited by 11 U.S.C. § 502(b)(6) only as a general unsecured claim, of which nothing would be paid upon estate distribution (rather than a higher-priority administrative-expense claim, which would have been entitled to an 85% payment). *Id.* at 22. Nostas appealed to the district court, arguing that the claim was entitled to administrative-expense status, but the district court affirmed the bankruptcy court's decision, reasoning that once the trustee surrendered the store to Nostas, the debtor in possession derived no further benefit from the lease. *Id.*

On appeal, the Second Circuit reexamined whether the debtor in possession continued to benefit from the lease after the trustee terminated it. *Id.* at 24–26. The appellate court opined that acquisition of the ability to assign the immediate and future rights of possession had a present value at the time of the post-petition assumption of the lease. *Id.* at 26. However, the Court noted that the Bankruptcy Code "distinguishes between leases that have been assumed, and those that have not," and section 502(g) "clearly instructs us that claims arising from *unassumed* leases are to be allowed as general unsecured claims." *Id.* (emphasis in original). Ultimately, the Second Circuit allowed the assumed lease as an administrative expense. *Id.*

The Court looks to section 502(g) to determine whether the claim for future rent under the terminated lease should be categorized as an administrative expense or as a general unsecured claim. Section 502(g) provides as follows:

> (1)    A claim arising from the rejection, under 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.
>
> (2)    A claim for damages calculated in accordance with section 562 shall be allowed under subsection (a), (b), or (c), or disallowed under subsection (d) or (e), as if such claim had arisen before the date of the filing of the petition.

11 U.S.C. § 502(g). Collier's treatise on bankruptcy contains some further explanation of section 502(g):

> Section 502(g) causes the claims of a nondebtor party upon rejection of an executory contract or unexpired lease to relate back to the date of the filing of the petition. The statutory framework of section 502(g) provides for the allowance of a claim arising from the rejection of an unexpired lease in the amount which would be recoverable by the nonbreaching party as of the time the petition was filed. The statute itself mandates that postpetition rejection fixes the liability of the debtor, and therefore the recovery of the creditor, as of the petition date.

3 Collier on Bankruptcy ¶ 502.08[1] (16th ed. 2022). Further, as pertains specifically to a section 365 rejection:

> Section 365 allows for the termination of a lease through "rejection." Section 502(g) provides that to the extent the claim for rejection is allowable, the attendant claim is treated as a prepetition claim for the damages flowing from the rejection. The injured entity is thus treated as a prepetition creditor as to that claim.

*Id.* ¶ 502.08[2]. Additionally, where, pursuant to a lease, "a debtor has possession of property of a nondebtor party, section 502(g) does not preclude the nondebtor party from seeking an allowed

administrative expense for the value of the use of its property between the date of filing of a

debtor's petition and the date of the surrender by the debtor of the property." *Id.* ¶ 502.08[2][a].

Administrative expenses may be granted under section 503(b)(1)(A) for "the actual,

necessary costs and expenses of preserving the estate, including wages, salaries, or commissions

for services rendered after the commencement of the case." 11 U.S.C. § 503(b)(1)(A). The

Southern District of New York has clearly explained the statutory purpose of granting

administrative expenses a higher priority than general unsecured claims:

> The purpose of granting administrative expense priority in a Chapter 11 context is
> to give creditors an incentive to continue to conduct business with a bankrupt entity,
> thus aiding in the debtor's maintenance, preservation and rehabilitation. To
> accomplish these goals, Chapter 11 confers higher priority on creditors that
> continue to perform under executory contracts and unexpired leases than to general
> unsecured creditors by granting the former administrative expense status.
> Continued performance on such obligations is not enough, however, because the
> examination of an administrative expense claim focuses on the actual benefit that
> such transactions confer on the estate, not the loss sustained by such creditors.

*In re CIS Corp.*, 142 B.R. 640, 643 (S.D.N.Y. 1992) (citations omitted). To warrant administrative

expense status, the Landlord must first show "either that the debtor-in-possession (not the

pre-petition entity) incurred the transaction on which the claim is based, or that the claimant

furnished the consideration to the debtor-in-possession." *Id.* Second, the Landlord "must show

that the transaction resulted in a direct benefit to the debtor-in-possession." *Id.*

The Landlord has not shown that the debtor-in-possession incurred the transaction at the

heart of its claim after the Petition Date, since the settlement agreement purportedly apportioning

the Subtenant eight months of future rent was executed more than a month before the Petition

Date. At best, on the first prong, the Landlord asserts that it has furnished consideration to the

Debtor by allowing the Debtor to use the Premises for eight months, asserting in its Lease

Rejection Objection that the Subtenant retained possession up to that time. *See* Lease Rejection Objection at 9–10. That assertion is insufficient to meet the first requirement of the administrative-expense test, as described below.

In its Lease Rejection Objection, the Landlord maintains that "substantial questions exist as to whether [the Subtenant] actually vacated the property because it continues to engage contractors to perform work at the [Premises]—including removal of [the Subtenant's] signage—after the abandonment date alleged by Debtor." Lease Rejection Objection at 9–10. In the Claim Reduction Objection, the Landlord asserts that "neither Debtor nor [the Subtenant] have obtained the necessary permits to remove the exterior signage from the [Premises], which remains to this day." Claim Reduction Objection at 15. Thus, "because the signage remains Debtor and [the Subtenant] have not returned possession of the [Premises] to Landlord, which directly impacts on Landlord's ability to relet the [Premises] because no reasonable commercial tenant would rent the [Premises] with signage in place risking an intellectual property infringement claim from [the Subtenant]." *Id.* at 15–16. The Claim Reduction Objection cites nothing in support of its view that reletting the property with the Subtenant's signage in place would cause the new tenant to incur an intellectual-property claim. Under the Landlord's view, "the continued signage at the [Premises] confirms that Landlord furnished a post-petition benefit to Debtor because the Settlement Agreement required removal of the signage as part of the overall settlement which enriched the estate, and Landlord should not be obligated to subsidize a payment to Debtor's Insiders at its own cost and expense." *Id.* at 16. The Landlord supplements its Claim Reduction Objection with a declaration from David Malanga (the "Malanga Decl."),[35] an employee of the

---

[35]    *Declaration of David Malanga*, ECF No. 92.

Landlord's parent company, in which Mr. Malanga declares that the signage has not been removed as of November 8, 2022, and as a result, "the [Premises] remains untenantable as a new commercial tenant will not occupy the premises under another company's signage and, indeed, I am advised by my attorneys that Landlord and any new tenant would risk legal action brought by [the Subtenant] for, among other things, copyright and trademark violations if they did so." Malanga Decl. ¶ 7.

As relates to the issue of whether the Subtenant (and, by extension, the Debtor) is still in possession of the Premises, the Landlord's view that the Subtenant's signs prevent the Landlord from reletting the Premises must be rejected. However pernicious these signs may be,[36] the Landlord has a simple means to mitigate their harm—it may take them down. In its Lease Rejection Objection, the Landlord asserts that the Subtenant retained possession of the Premises because laborers were removing the signs—conversely, the Claim Reduction Objection tells the Court that the signs have been left up. *Compare* Lease Rejection Objection at 9–10, *with* Claim Reduction Objection at 15–16. Assuming, arguendo, that the Claim Reduction Objection was mistaken, and that the November 2022 Malanga declaration accurately describes the status of the Subtenant's signs, the Landlord has not explained why the Subtenant (or even the Debtor) must be the party that removes these signs. While the Settlement Agreement does impose a burden on the Subtenant to remove the signs, the Landlord is not a party to that agreement and has not explained why it is entitled to the Subtenant's performance of that (apparently immaterial) term. And even

---

[36] It is dubious at best that any new tenant would incur an intellectual property claim from the continued display of the Subtenant's signs. An intellectual property claim accrues upon the reproduction or distribution of protected material. *See Petrella v. Metro Goldwyn Mayer, Inc.*, 572 U.S. 663, 671 (2014) ("Each time an infringing work is reproduced or distributed, the infringer commits a new wrong."); *Derek Andrew, Inc. v. Poof Apparel Corp.*, 528 F.3d 696, 701 (9th Cir. 2008) (characterizing a months-long violative act as one continuous infringement, rather than a series of new infringements), *with Troll Co. v. UneedaDoll Co.*, 483 F.3d 150, 158 (2d Cir. 2007) (explaining that, in a continuous series of infringing acts, the infringement commences on the first act).

if the Subtenant owed the Landlord a duty to remove signage as a result of the Settlement Agreement, and the Subtenant were consequently in breach, there would be nothing to prevent the Landlord from removing the signage itself to mitigate the assertedly insurmountable stumbling block those signs pose to the Premises' marketability.  In short, the continued presence of signage at the Premises does not establish the Subtenant's or the Debtor's possession.  Because neither the Subtenant nor the Debtor is in possession of the Premises, nor have they been since the Petition Date, the Landlord has not demonstrated that it furnished the Debtor with consideration.  *See In re CIS Corp.*, 142 B.R. at 643.

The general rule is that a claim arising from a section 365 rejection of an unexpired lease "that has not been assumed . . . shall be determined" under section 502(a), (b), or (c).  11 U.S.C. § 502(g).  As discussed above, it is undisputed that the Debtor has a valid claim for one year's rent under section 502(b)(6)(A)(ii).  Section 502(g) requires the Court to treat all claims arising from the breach under section 502, which the Court has done.  Because the Landlord has not shown that it furnished the Debtor with consideration (because the Premises was not in the Debtor's possession), it has not met its burden to demonstrate that its claim is entitled to administrative-expense status under section 503.  *See In re CIS Corp.*, 142 B.R. at 643.  Moreover, because the Lease has not been assumed, the Court is skeptical as to whether an administrative-expense claim would be permissible even if the Landlord had furnished the Debtor with consideration.  *See In re Klein Sleep Prods.*, 78 F.3d at 26.  Fundamentally, this is not a claim that arises from an agreement between the Debtor and the Landlord to assume the Lease, such that an administrative-expense claim would arise as an exception to the rule in section 502(g).  *See id.*  Thus, in these circumstances, where the Court has determined that the Lease is rejected as of the Petition Date, and the Landlord claimant has not shown that the Debtor has not been in possession

31

of the Premises subsequent to the Petition Date, no administrative-expense claim is permissible. *See* 3 Collier on Bankruptcy ¶ 502.08[2][a].

5.    General Unsecured Claim

The Landlord asserts that, if the Court disallows the administrative-expense claim, the Landlord "must be entitled to a general unsecured claim for the buyout Lease term in addition to its rejection damages because these damages are distinct from Landlord's rejection damages." Claim Reduction Objection at 16.  For property claims, state law controls, "unless it conflicts with Bankruptcy law."  *Id.*; *see Nobelman v. American Sav. Bank*, 508 U.S. 324, 329 (1993) ("In the absence of a controlling federal rule, we generally assume that Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.'" (alteration in original) (quoting *Butner v. United States*, 440 U.S. 48, 54–55 (1979))).  Section 502(b)(6) does not prevent a landlord from separately asserting a claim for pre-petition damages that do not directly arise from termination, since that provision applies to lease-termination damages only once a Debtor rejects an unexpired lease post-petition. Claim Reduction Objection at 17 (citing *In re Filene's Basement, LLC*, No. 11-13511, 2015 WL 1806347, *25 (Bankr. D. Del. Apr. 16, 2015); *In re Living Hope Southeast, LLC*, 505 B.R. 237, 244, n.12 (Bankr. E.D. Ark. Jan. 29, 2014)).  Thus, "if Landlord's claim for bought-out rent is not an administrative expense claim, it must still be available for Landlord general unsecured claim because it arises distinct from damages related to rejection of the Lease."  *Id.*

The Landlord maintains that, absent certain settlement terms between the Subtenant and the Debtor, under section 4 of the Lease, it could have pursued the Subtenant directly for the buyout

period that the Debtor refused to pay to the Landlord.  *Id.* at 17.[37]  Additionally, the Landlord

repeats its refrain that the failure by the Subtenant and the Debtor "to remove the exterior signage

caus[ed] significant damage to Landlord on a continuing basis and prevent[ed] Landlord from

re-letting the [Premises]."  Claim Reduction Objection at 17.

Essentially, the Landlord asserts that the settlement, which purportedly assigned or

otherwise encumbered the Lease in violation of the lease agreement, gives rise to a general

unsecured claim equal to the "bought out" sublease term and separate from the claim for

termination damages.  *Id.* at 17.  Apparently, the Landlord also relies on the residual signage as a

separate basis for the general unsecured claim.  *Id.* at 17–18.

The Court declines to allow the Landlord a general unsecured claim in the amount of

$616,024.84.  The Landlord's primary argument on this point is that a buyout term under section 4

of the Lease gives rise to damages that are distinct from the Landlord's rejection damages.  Claim

Reduction Objection at 16.  The Landlord says that lease termination does not terminate a

contract—it is only a breach.  *Id.* (citing *Fisher Bros. Mgmt. Co., LLC v. Genco Shipping &*

---

[37]    The printed text of section 4 of the Lease reads as follows:

Subject to the provisions of paragraph 4B[,] [n]either Tenant, nor Tenant's successors or assigns, shall assign,
mortgage, pledge or encumber this lease, in whole or in part, or sublet the demised premises, in whole or in
part, or permit the same to be used or occupied by others, nor shall this lease be assigned or transferred by
operation of law, without the prior consent in writing of Landlord in each instance.  If this lease be assigned
or transferred, or if all or any part of the demised premises be sublet or occupied by anybody other than
Tenant, Landlord may, after default by Tenant, collect rent from the assignee, transferee, subtenant or
occupant, and apply the net amount collected to the rent reserved herein, but no such assignment, subletting,
occupancy or collection shall be deemed a waiver of any agreement, term, covenant or condition hereof, or
the acceptance of the assignee, transferee, subtenant or occupant as a tenant, or a release of Tenant from the
performance or further performance by Tenant of the agreements, terms, covenants and conditions hereof,
and Tenant shall continue to be liable hereunder in accordance with the agreements, terms, covenants and
conditions hereof.  The consent by Landlord to an assignment, mortgage, pledge, encumbrance, transfer or
subletting shall not in any wise be construed to relieve Tenant from obtaining the express consent in writing
of Landlord in accordance with this [paragraph] 4 to any further assignment, mortgage, pledge, encumbrance,
transfer or subletting.

Lease at 5–6.  The phrases "Subject to the provisions of paragraph 4B" and "in accordance with this par. 4" are
handwritten additions to this document.  *Id.*

33

*Trading Ltd. (In re Genco Shipping & Trading Ltd.)*, 550 B.R. 676, 682 (S.D.N.Y. 2015)).
Fundamentally, as clarified at the hearing, the Landlord believes the liability arising from
bought-out rent due to the Landlord under the Lease (but impermissibly paid by the Subtenant to
the Debtor instead) is distinct from the overall lease-rejection claims. *See id.*

On the other hand, the Debtor briefly says that the purported buy-out is subject to the
Bankruptcy Code's cap on landlord claims.[38]  Claim Reduction Reply ¶ 10.  As discussed above,
throughout this case, the Debtor has vigorously defended its position that the settlement it entered
into with the Subtenant did not apportion her eight months of future rent in exchange for the
settlement payment.  In any event, the Debtor argues that even if its settlement agreement did
violate section 4 of the Lease, any liability incurred under that section still related to "payment of
'rent reserved by such lease' and is not, therefore, an independent basis for damages under section
502(b)(6)(A) of the Code."  *Id.* ¶ 12 (quoting 11 U.S.C. § 502(b)(6)(A)).

As discussed above, the Court agrees with the Debtor that the Lease did not persist after
the Petition Date, and the Subtenant did not occupy the space for eight months thereafter.
Accordingly, there is no liability under section 4 of the Lease for the Landlord to collect rent from
the Subtenant and "apply the net amount collected to the rent reserved herein."  Lease § 4.

While the Court need not look any further, in the interest of completeness, it addresses the
Debtor's alternative argument on this point.  Even if the Debtor had incurred such liability under
the Lease, it would have been encompassed by the Bankruptcy Code's cap as delineated by
section 502(b)(6)(A).  Section 4 specifically says that the net amount of rent collected directly

---

[38]    To the extent that the Debtor asserts that the Landlord is pursuing a state action against the Subtenant, the Court
notes that it has not advanced evidence of such litigation.  Given the resolution of this issue in the Debtor's favor, the
Court need not resolve this component of the Debtor's alternative argument.  *See* Claim Reduction Reply ¶ 11.

from the subtenant or occupant will be applied to the rent reserved by the Lease, i.e., reducing the amount of outstanding rent reserved. Section 502(b)(6)(A) also reduces the outstanding rent reserved by a lease, reducing it to the statutorily calculated cap, as discussed above. Under the terms of the Lease, if the Landlord were to collect funds directly from the Subtenant, the proceeds of that rent would further reduce the rent reserved by the Lease. Since the Landlord is receiving all of the outstanding rent reserved by the Lease, subject to the statutory cap, allowing the Landlord an additional claim for its purported right to collect further rent reserved directly from the Subtenant would sanction a potential award for rent reserved significantly in excess of the statutory cap. Such an allowance would unfairly dilute other unsecured claims, and it would essentially allow the Landlord a double recovery for certain months' rent.

To the extent that the Landlord relies on the Subtenant's purported occupancy of the Premises as a ground for its general unsecured claim, that argument is meritless. As discussed above, irrespective of any unremoved signage, the Subtenant did not occupy the Premises for the post-petition period asserted by the Landlord.

6.   <u>Attorneys' Fees</u>

The Debtor says that under the prevailing-party legal fees provision in the Lease, the Landlord is entitled only to the legal fees it incurred for obtaining the State Court Judgment, and the Debtor is entitled to offsetting legal fees for the Landlord's two failed attempts to attach the Subtenant settlement's proceeds. Claim Reduction Motion ¶¶ 19–24.

Section 11a of the June 20, 2002 Lease Addendum contains a prevailing-party fee provision which states: "in the event of the commencement of a lawsuit by either Landlord or Tenants against the other, the prevailing party will recovery reasonable attorney's fees." *Id.* ¶ 19. In its September 1, 2021 decision awarding the landlord summary judgment, the State Court

severed the issue of attorneys' fees for consideration at a later date.   September 2021 Decision &

Order on Motions at 2.   On September 9, 2021, the Debtor filed the affirmation of its parent

company's in-house attorney, Bension D. DeFunis, who asserted that the reasonable rate for his

time and another similarly experienced in-house counsel (Reena Malhotra) was $650 per hour.

D'Artiglio Decl., Exhibit G ¶¶ 8–13.   Mr. DeFunis asserted that he and Ms. Malhota spent a

combined time of 140.9 hours on the Landlord State Court Action, which amounted to $91,585.00

in attorneys' fees.  *Id.* ¶¶ 14–18.   Before the State Court could consider the matter, the Debtor filed

its Petition, staying the state-court proceedings.   *See* Claim Reduction Objection at 5.   In the

Landlord Claim, the Landlord seeks $91,585.00 for in-house legal fees and costs recoverable

pursuant to the Lease.   In support of the claim, it annexes the time records that the  Landlord

submitted to the State Court.  *See* Landlord Claim, Exhibits G, H.[39]

The Debtor contends that the Landlord prevailed in obtaining summary judgment, but that

it prevailed in defeating Landlord's motion to attach the proceeds of the Settlement Agreement

and the Landlord's request for reconsideration after the State Court denied that motion.   Claim

Reduction Motion ¶ 20. The Debtor maintains that under the Lease, the Landlord is not entitled to

recover fees and costs associated with the unsuccessful prosecution of the attachment litigation,

and that the Debtor is entitled to recover the fees and costs it incurred in its successful defense of

the attachment litigation.   *Id.* ¶¶ 20, 23.   Based on its review of the time records, the Debtor has

determined that the Landlord's in-house counsel spent 74 hours on the State Court complaint and

summary judgment motion.   It argues that at $650/hour, the maximum fees payable to the Landlord

---

[39] As filed, the Landlord Claim sought outside-counsel fees and costs totaling $16,559.14.  In the Claim Reduction
Objection, the Landlord purports to amend the claim to include $55,502.40 in outside-counsel fees and costs.  *See*
Claim Reduction Objection at 11–12; D'Artiglio Decl. Exhibit H (time records).  The Debtor has not objected to the
outside-counsel fees and costs.

under the Lease totals $48,100.  First, it contends that the $91,585 should be reduced to $48,100, "by expunging the amounts attributable to the attachment litigation." *Id.* ¶ 21.  Second, because "[l]egal fees should not be a profit center for the Landlord," and "[i]f in-house counsel is salaried," then the Landlord ought to be "entitled to no more than it incurred for 74 hours of in-house counsel's time." *Id.* ¶ 22; *see* Claim Reduction Reply at 1 ("Prevailing party in-house legal fees should be limited to an actual salary incurred—they should not be a profit center for the Landlord.").  Third, it ought to be permitted to set off from the Landlord Claim an unliquidated amount representing the fees and costs it incurred in the attachment litigation. *Id.* ¶23.  The Landlord disputes those contentions.  Claim Reduction Objection at 9.

Under New York law, it is settled that when a contract entitles a party to legal fees, "such relief is only available to the prevailing party, who must also prevail on a central issue in the relevant action."  *Grand Concourse Estates, LLC v. Ture*, No. LT-900160/15, 2018 N.Y. Misc. LEXIS 4686, *5 (N.Y. Civ. Ct. Oct. 18, 2018) (unpublished table decision); *see also East Aurora Coop. Mkt., Inc. v. Red Brick Plaza, LLC*, 197 A.D.3d 874, 876 (N.Y. App. Div. 2021) (holding that fees are only awarded to a prevailing party who "prevailed with respect to the central relief sought").  In applying that rule, and in assessing who is considered a prevailing party and what constitutes a central issue, courts consider the scope of the dispute litigated, and what each party achieved within that scope.  *East Aurora Coop. Mkt.*, 197 A.D.3d at 876; *see also Grove St. Equities LLC v. Butensky*, No. 69901/1011, 2020 N.Y. Misc. LEXIS 2222, *5 (N.Y. Civ. Ct. 2020) (unpublished table decision) ("To be considered a prevailing party, one must prevail on the central claims advanced, and receive substantial relief in consequence therof.").  A party who prevails by summary judgment is entitled to attorneys' fees and costs as the "prevailing party." *In re McKain Law PLLC v. Brutvan*, 989 N.Y.S.2d 274, 276 & n.2 (N.Y. Sup. Ct. 2014).

The Landlord contends, and the Court agrees, that it prevailed in the Landlord State Court Action because the money judgment for unpaid rent and additional rent was the central issue in the litigation, which Landlord obtained via summary judgment overruling all of Debtor's defenses. Claim Reduction Objection at 9–10. The attachment litigation plainly was not central to that action because the attachment would be meaningless unless the Landlord obtained a judgement against the Debtor. The Court finds that under the Lease, the Landlord is entitled to recover the reasonable fees expended in the Landlord State Court Action. As such, subject to its determination of the reasonableness of the fees, the Court overrules the Debtor's objection to the inclusion of the fees and costs incurred by the Landlord in connection with the attachment litigation in the fees recoverable under the Lease. The Court also finds that the Debtor is not a "prevailing" party under the Lease and, as such, the Court rejects the Debtor's request for leave to set off from the Landlord Claim an unliquidated amount representing the fees and costs it incurred in the attachment litigation.

The Court now considers whether the attorneys' fees charged by in-house counsel are reasonable. The Court finds no merit to Debtor's assertion that in-house counsel's fees should be limited to the actual salaries they are paid. "It is well-settled that attorneys' fees and costs should be awarded for litigation performed by in-house counsel if such fees would be awarded for the same work performed by outside counsel." *Video-Cinema Films, Inc. v. Cable News Network, Inc.*, 98-cv-7128, 2004 WL 213032, at * 6 (S.D.N.Y. Feb. 3, 2004). Courts usually determine an appropriate fee for in-house counsel's services based on what the appropriate fee would be for work performed by "independent counsel for similar services." *Id.* (quoting *Broadcast Music v. R Bar*, 919 F. Supp. 656, 661 (S.D.N.Y. 1996)). As support for the reasonableness of the rate charged, the Landlord points to a May 2022 decision in which an affiliate's in-house counsel was

38

awarded attorneys' fees "at a reasonable hourly rate commensurate with the one sought here, without limiting in-house counsel to fees and costs based on their salary." Claim Reduction Objection at 11 n.6 (citing *211 Dyckman Street LLC v. International Food House Restaurant Inc. d/b/a Albert's Mofongo Restaurant & Bar Lounge*, No. LT-306681/21 (N.Y. Civ. Ct. May 27, 2022)); *see* D'Artiglio Decl., Exhibit I. In that case, the opposing party "failed to appear for the attorney fees hearing." D'Artiglio Decl., Exhibit I at 1 n.1. Moreover, the landlord sought compensation at $650.00 per hour for 50.2 hours of work, solely on a summary-judgment motion and a reply to an objection to the motion. The state court reduced in-house counsel's rate to a "$550.00 hourly rate as the prevailing rate." *Id.* at 1 (citing *Rangoon Inc. v. Yi Gui Lin*, 110 N.Y.S.3d 493 (N.Y. Civ. Ct. 2018)). The state court further reduced counsel's billed hours, finding "36.3 hours to be more reasonable given the work involved." *Id.*

The Court finds that, as in *211 Dyckman Street* and *Rangoon*, $550.00 is a reasonable hourly rate for the work performed by Landlord's in-house counsel in the Landlord State Court Action. The records reflect that in-house counsel performed 140.9 hours of work. The Debtor does not challenge the reasonableness of the quantity of hours of work. At a rate of $550.00 per hour, this amounts to a total of $77,495 in reasonable attorneys' fees for in-house counsel.

## Conclusion

Accordingly, the Court grants the Lease Rejection Motion and the Claim Reduction Motion. In granting the Lease Rejection Motion, the Court grants retroactive relief, rejecting the Lease *nunc pro tunc* as of the Petition Date. In granting the Claim Reduction Motion, the Court (i) calculates the statutory cap on lease-rejection damages to be $942,947.52; (ii) determines that the portion of the Landlord Claim for unpaid rent through July of 2021 is $1,295,914.80; (iii) determines that the portions of the Landlord Claim seeking additional compensation for

postpetition use of the Premises are impermissible as either an administrative claim or as a general unsecured claim; and (iv) determines that attorneys' fees payable to the Landlord's in-house counsel under the Lease total $77,495.

IT IS SO ORDERED.

Dated: New York, New York
          December 22, 2023

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge