**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

In re:                                                    :    Chapter 11
                                                          :
Mallett, Inc.,                                            :    Case No. 21-11619 (JLG)
                                                          :
                                    Debtor.               :
-------------------------------------------------------------x

### MEMORANDUM DECISION AND ORDER GRANTING THE TRUSTEE'S RULE 9019 MOTION TO APPROVE SETTLEMENT

<u>**APPEARANCES:**</u>

WHITE AND WILLIAMS LLP
*Subchapter V Trustee of the Estate of Mallett, Inc.*
7 Times Square, Suite 2900
New York, New York 10036
By:    Heidi J. Sorvino

CULLEN AND DYKMAN, LLP
*Counsel for Dover Street Ltd., The Fine Art Auction*
*Group Ltd., Stanley Gibbons Ltd., Milsom Street*
*Limited, and Octagon Chapel Limited*
100 Quentin Roosevelt Boulevard
Garden City, New York 11530
By:    Thomas R. Slome

ANSELL GRIMM & AARON, P.C.
*Counsel for 929 Madison Avenue, LLC*
365 Rifle Camp Road
Woodland Park, New Jersey 07424
By:    Anthony J. D'Artiglio
       Joshua S. Bauchner

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction[1]

Mallett, Inc. (the "Debtor") is a subchapter V chapter 11 debtor herein. Heidi Sorvino (the "Trustee") is the Debtor's court-appointed subchapter V trustee. The matter before the Court is the Trustee's motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") to approve to approve the settlement of the Affiliates' claims against the Debtor (the "Motion").[2] Collectively, the Affiliates hold the largest claim in the case. After the Affiliates, the Landlord is, by far, the Debtor's largest creditor.[3] It objects to the Motion (the "Objection").[4] The Trustee replied to the Objection.[5] The Affiliates, who support the Motion,

---

[1] Capitalized terms that are not defined in the Introduction have the same meanings as those subsequently defined herein.

[2] *Application to Approve Settlement with Affiliates*, ECF No. 73-1. References to "ECF No. __" are to documents filed on the electronic docket in this chapter 11 case under Case Number 21-11619.

[3] On December 22, 2023, the Court entered the *Order Granting the Debtor's Lease Rejection Motion and Claim Reduction Motion*, ECF 160 ("Rejection and Reduction Order"). In the Rejection and Reduction Order, the Court substantially reduced the Landlord's claim. The remaining claims seeking a liquidated amount include the New York State Department of Tax & Finance, in the amount of $3,870.15 [Claim No. 1-2]; Consolidated Edison Company of New York Inc, in the amount of $86.93 [Claim No. 4-1]; and the New York City Department of Finance, in the amount of $10,680.74 [Claim No. 6-2]. The Debtor's scheduled claims in its *Petition, Schedule E/F: Creditors Who Have Unsecured Claims*, ECF No. 1 at 15–17 ("Debtor's Schedule E/F"), excluding those that filed an Official Form 410, include: Belkin Burden Wenig & Goldman at $347.50; Dover Street Ltd at $72,410.00; Fleming Zulack Williamson Zauderer at $4,943.74; Glenn Randall at $3,550.00; Hugh Wood Inc at $4,798.50; Milsom Street Limited at $6,865,660.00; Octagon Chapel Limited at $3,959,176.00; Premier Cleaning Pro Solutions Corp at $429.00; San Francisco Fine Art Galleries at $8,215.00; Stanley Gibbons Ltd at $274,505.00; The Fine Art Auction Group Ltd at $708,040.00; and Willy Rizzo at $1,193.00.

[4] *Creditor/Landlord 929 Madison Avenue, LLC's Memorandum of Law in Opposition to Trustee's Motion to Approve Settlement*, ECF No. 93.

[5] *Trustee's Reply to Landlord's Opposition to Application to Approve Settlement with Affiliates*, ECF No. 104 ("Trustee Reply").

also replied to the Objection[6] and submitted, in support of the Motion, the declaration of Kevin

Fitzpatrick, the director and the Chief Financial Officer of the Affiliates.[7]

The Court conducted a hearing on the Motion.  For the reasons set forth herein, the Court

overrules the Objection and grants the Motion.

## **Background**

### **The State Court Actions**

The Debtor is an antique dealer that operated a store at 929 Madison Avenue, New York,

New York (the "Premises").  Shircore Aff. ¶ 3.[8]  In 2016, the Debtor closed the store and subleased

the Premises (the "Sublease") to Stella McCartney, a fashion retailer (the "Subtenant").  *Id.*  The

Subtenant stopped paying rent to the Debtor, and the Debtor, in turn, could not pay rent to its

landlord, 929 Madison Avenue LLC ("Landlord"), from whom the Debtor leased the Premises (the

"Lease").  *Id.*

The Debtor sued the Subtenant for unpaid rent in the Supreme Court of the State of New

York (the "State Court") in November 2020 (the "State Action").  In January 2021, the Subtenant

answered the Debtor's complaint, asserted counterclaims against the Debtor, and filed a third-party

complaint against the Landlord.  In that same action, the Landlord sued the Debtor for unpaid rent

under the Lease.

The State Court ordered mediation in the State Action.  With the mediator's assistance, the

Debtor reached a settlement with the Subtenant, but not the Landlord.  *See id.* ¶ 6.  Thereafter, the

---

[6] *Affiliate Creditors' Memorandum of Law in Reply to Opposition of Landlord to Trustee's Motion to Approve Settlement*, ECF No. 102 ("Affiliate Reply").

[7] *Declaration of Kevin Fitzpatrick in Support of Trustee's Motion to Approve Settlement*, ECF No. 102-1 ("Fitzpatrick Dec.").

[8] *Local Rule Statement*, ECF No. 2 ("Shircore Aff.").

State Court awarded the Landlord a judgment against the Debtor in the sum of $1,281,068 for pre-petition rent. *Id.* ¶ 8.

### The Bankruptcy

On September 15, 2021 (the "Petition Date"), the Debtor filed a voluntary chapter 11 petition for bankruptcy (the "Petition")[9] under title 11 of the United States Code (the "Bankruptcy Code"). Petition ¶ 8. On September 17, 2021, the Debtor filed an amended voluntary petition (the "Amended Petition"),[10] wherein the Debtor elected to proceed as a small business debtor under Subchapter V of chapter 11. Amended Petition ¶ 8.

Stanley Gibbons Group plc ("Stanley Gibbons Group" or "Group") is a publicly traded company organized under the laws of the United Kingdom. Motion ¶ 12. The record reflects that the Debtor is a wholly owned subsidiary of Octagon Chapel Limited ("Octagon"). Petition ¶ 28, at 26. Dover Street Ltd ("Dover"), Milsom Street Limited ("Milsom"), Octagon, Stanley Gibbons Ltd ("Stanley") and The Fine Art Auction Group Ltd ("Fine Art," together with Octagon, Dover, Milsom, and Stanley, the "Affiliates") also appear to be direct or indirect subsidiaries of Stanley Gibbons Group. Motion ¶ 7. The Debtor scheduled the Affiliates (each an "Affiliate") as holding non-contingent, liquidated, undisputed, unsecured claims (the "Affiliate Claims") aggregating $11,879,791.00. *See* Debtor's Schedule E/F.

The claims bar date was December 15, 2021.[11] On December 14, 2021, the Landlord timely filed a claim against the Debtor in the sum of $1,498,126.43. *See* Proof of Claim No. 5-1.

---

[9] *Voluntary Petition for Non-Individuals Filing for Bankruptcy*, ECF No. 1.

[10] *Amended Voluntary Petition for Non-Individuals Filing for Bankruptcy*, ECF No. 7.

[11] *Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, ECF No. 24.

On January 28, 2022, the Landlord filed its second amended proof of claim in the sum of $3,079,296.16 (the "Landlord Claim").[12]  The Affiliates did not file proofs of claim herein.

By order dated April 22, 2022, the Court confirmed the Debtor's chapter 11 plan.[13]

### The Motion

Through the Motion, the Trustee seeks an order pursuant to Bankruptcy Rule 9019 approving a reduction of the Affiliate Claims by 15%, in exchange for the Court's allowance of those claims in the aggregate sum of $10,097,823 (the "Compromise").  Motion ¶ 60.

In support of the Motion, the Trustee attached the books and records of the Debtor and Affiliates as Exhibits A–F to the Motion, as follows:

- Exhibit A: Dover's books and records;

- Exhibit B: Octagon's books and records;

- Exhibit C: Stanley's books and records;

- Exhibit D: Fine Art's books and records;

- Exhibit E: Milsom's books and records, including the loan agreements; and

- Exhibit F: Debtor's unaudited books and records.

---

[12] The Landlord Claim is part of the Court's Claims Register as Claim No. 5-3.  On December 22, 2023, on the Trustee's Lease Rejection Motion and Claim Reduction Motion, the Court (i) calculated the statutory cap on the Landlord's lease-rejection damages to be $942,947.52; (ii) determined that the portion of the Landlord Claim for unpaid rent through July of 2021 is $1,295,914.80; (iii) determined that the portions of the Landlord Claim seeking additional compensation for postpetition use of the Premises are impermissible as either an administrative claim or as a general unsecured claim; and (iv) determined that attorneys' fees payable to the Landlord's in-house counsel under the Lease total $77,495.  Rejection and Reduction Order at 39-40; *see Debtor's Motion for Entry of Interim and Final Orders (A) Authorizing Unexpired Lease Rejection Nunc Pro Tunc to the Petition Date, (B) Approving Lease Rejection Procedures, and (C) Authorizing the Abandonment of Certain Property in Connection Therewith, Each Effective Nunc Pro Tunc to the Petition Date, and (D) Granting Related Relief*, ECF No. 5; *Motion to Reduce Claim 5 of 929 Madison Avenue LLC*, ECF No. 79.

[13] *Debtor's First Amended Chapter 11 Plan of Reorganization Under Subchapter V of the Bankruptcy Code*, ECF No. 50; *Findings of Fact, Conclusions of Law, and Order Confirming Debtor's Amended Plan of Reorganization for Small Business Under Subchapter V of Chapter 11*, ECF No. 66.

The Affiliates' books and records contain audited financial statements and other evidence of advances and partial repayments of the intercompany debt. Motion ¶ 15. The Debtor and the Affiliates provided the Trustee with "copies of the audited publicly filed books and records for all Affiliates, the Debtors [sic] matching unaudited books and records, various loan documents, and other evidence of ongoing advances and partial repayments of the intercompany debt." *Id.*

The Trustee explains that in arriving at the Compromise, she has analyzed potential objections to the Affiliate Claims based on inadequate documentation of those claims and a potential claim for the recharacterization of the Affiliate Claims as equity. *Id.* ¶ 39. During her assessment of the Affiliate Claims, the Trustee demanded documentation from the Debtor and Affiliates. *Id.* ¶ 40. Although the Affiliates produced "loan documents and evidence of funds transfers for most of the claims," the Debtor and Affiliates explained that because many of the claims arose years ago, it would be burdensome to produce additional documents. *Id.* Despite the incomplete documentation of the Affiliate Claims, the Trustee argues that there is a low likelihood of successfully objecting to those claims on the basis of inadequate documentation. *Id.* ¶ 41. She also contends that in light of the documents evidencing the claims, it is doubtful that a non-frivolous objection could be lodged to recharacterize the Affiliate Claims as equity. *Id.* ¶ 59.

The Landlord asks the Court to deny the Motion and authorize it, as the Debtor's largest non-Affiliate creditor, to challenge the Affiliate Claims for the benefit of the estate. It complains that the Compromise is not the product of an arms-length negotiation; it provides essentially no benefit to the Debtor's non-Affiliate creditors and merely ensures that the Affiliates can secure almost all of the Debtor's assets for themselves. Objection at 1–2. The Landlord asserts that the Compromise provides for only a *de minimis* 3.5% increase in distribution to the non-Affiliate creditors, which falls below the lowest range of reasonableness for a compromise. *Id.* at 2.

According to the Landlord, a challenge against the Affiliate Claims would likely succeed because: (i) the Affiliate Claims are "wholly undocumented," and the Debtor and the Affiliates lack knowledge of the critical facts needed to support those claims; (ii) more than $10 million of the Affiliate Claims are barred by the six-year statute of limitations for an action to recover for breach of contract; and (iii) in any event, even if the Affiliate Claims are not disallowed for those reasons, it is likely that they could be recharacterized as equity because the alleged loans are actually capital contributions disguised as debt, and the Affiliates lack the documentation needed to refute that recharacterization. *Id.* at 1–2.

Below, the Court recounts the Landlord's and Trustee's respective positions on the sufficiency of the documentation offered in support of the Affiliate Claims.

### *Dover Claim: $72,410.00*

In support of the Dover Claim, the Trustee relies on (i) an Excel spreadsheet provided by Dover titled "Insider creditor breakdown Dover Street," which summarizes the Dover claim, including when Dover asserts amounts were advanced and partially repaid;[14] (ii) the fact that the indebtedness is reflected as a debt owing by the Debtor to Dover in both Dover's audited books and records[15] and in the Debtor's unaudited books and records;[16] and (iii) the fact that the debt is reflected as a general unsecured claim in the Debtor's Schedule E/F. Motion ¶¶ 18–19.

In opposing the Motion, the Landlord asserts that the Dover Claim is not adequately documented because (i) it is not supported by a loan agreement; (ii) the Debtor and the Affiliate

---

[14] The Trustee asserts that the "Insider creditor breakdown Dover Street" is included in Exhibit A to the Motion. *See* Motion ¶ 18. However, there is no document with that title within Exhibit A. The document titled "Dover Street Limited—Balances with Mallett Inc." on page 67 of Exhibit A is the only document that describes the transactions between Dover and the Debtor which the Trustee references. *See* Motion, Ex. A at 67.

[15] *See* Motion, Ex. A at 70–71, 75 (showing amounts owed from the Debtor in British Pounds).

[16] *See* Motion, Ex. F at 3–5, 9, 11 (showing amounts owed from the Debtor in U.S. Dollars).

Creditors do not know the purpose of the loans; and (iii) neither the Debtor nor Dover is in possession of any "source documents" establishing the validity of the debt. *See* Objection at 6 (citing Fitzpatrick Tr. at 30:18–21, 31:12–21, 32:6–7, and 33:17–23).[17]

***Octagon Claim: $3,959,176***

The Octagon Claim is on account of Octagon's purchases of antique inventory for the Debtor. Motion ¶ 20. The Trustee explains that Milsom was in the business of selling antiques in the United Kingdom but was not registered to do business in the United States. *Id.* Octagon acquired the inventory from Milsom in the United Kingdom, for the benefit of the Debtor. *See id.* ¶¶ 20–21. In support of the Octagon Claim, the Trustee relies on (i) an Excel spreadsheet provided by Octagon titled "Octagon Creditor breakdown"[18]; (ii) the fact that the indebtedness is reflected as a debt owed by the Debtor to Octagon in both Octagon's audited books and records[19] and the Debtor's unaudited books and records;[20] and (iii) the fact that the debt is reflected as an undisputed general unsecured claim in the Debtor's Schedule E/F. Motion ¶¶ 21–22.

In opposing the Motion, the Landlord asserts that (i) the Octagon Claim is not supported by a loan agreement, trading invoices, or any other kind of source documents; and (ii) the Debtor

---

[17] Citations to "Fitzpatrick Tr." refer to the deposition of Kevin Fitzpatrick, which is attached as Exhibit A to the *Declaration of Anthony J. D'Artiglio* (the "D'Artiglio Dec."), ECF No. 93-1.

[18] The Trustee asserts that the spreadsheet summarizes the fiscal year-end balances on the loan for each year from March 2011 forward. Motion ¶ 21. The Trustee notes that the balances changed often with substantial repayments (over $2 million) by the Debtor to Octagon from 2012 to 2018, when the Debtor liquidated the last of its inventory. *Id.* The Trustee also asserts that the "Octagon Creditor breakdown" is included within the documentation of Exhibit B to the Motion. *See* Motion ¶ 20. However, there is no document with that title within Exhibit B. The document titled "Account balance" on page 64 of Exhibit B is the only document that describes and tracks the transactions between Octagon and the Debtor which the Trustee references. *See* Motion, Ex. B (Octagon Books and Records) at 64.

[19] *See* Motion, Ex. B (Octagon Books and Records) at 65, 68–69 (showing amounts owed by the Debtor in British Pounds).

[20] *See* Motion, Ex. F (Debtor Books and Records) at 3–4, 9 (showing amounts owed by the Debtor in U.S. Dollars).

and the Affiliates could not identify if the Debtor made any payments towards the alleged debt. Objection at 6–7 (citing Fitzpatrick Tr. at 65:12–18, 68:16–25, 69:25–70:9).

***Stanley Claim: $274,505***

The Stanley Claim is on account of (i) monies advanced for real estate taxes paid by the Debtor; and (ii) legal fees paid by Stanley primarily to Seward & Kissel, in connection with a civil dispute between the Debtor and U.S. Department of Justice ("DOJ") over competing ownership claims to an antique. Motion ¶ 23. In support of the Stanley Claim, the Trustee cites to (i) professional fee invoices from Seward & Kissel;[21] (ii) Stanley's bank records showing payments to Seward & Kissel;[22] (iii) an Excel spreadsheet provided by Stanley titled "Stanley Gibbons Creditor breakdown" summarizing the payments made by Stanley for the Debtor and an offset amount due to a payment made by the Debtor on behalf of Stanley;[23] (iv) the fact that the indebtedness is reflected as a debt owing by the Debtor to Stanley in both Stanley's audited books and records[24] and the Debtor's unaudited books and records;[25] and (v) the fact that the debt is reflected as an undisputed general unsecured claim in the Debtor's Schedule E/F. Motion ¶¶ 24–26.

In opposing the Motion, the Landlord asserts (i) that the Stanley Claim is not supported by a loan agreement; (ii) while Stanley produced evidence of invoices and payments from and to

---

[21] *See* Motion, Ex. C (Stanley Books and Records) at 156–84.

[22] *See id.* at 185–87.

[23] The Trustee asserts that the "Stanley Gibbons Creditor Breakdown" is included in Exhibit C to the Motion. *See* Motion ¶ 24. However, there is no document with that title in Exhibit C. Only the document titled "Stanley Gibbos [sic] Limited - Amounts owed by Mallett Inc" on page 119 of Exhibit C describes the transactions between Dover and the Debtor that the Trustee references. *See* Motion, Ex. C (Stanley Books and Records) at 119.

[24] *See* Motion, Ex. C (Stanley Books and Records) at 120, 128, 139 (showing amounts owed by the Debtor in British Pounds).

[25] *See* Motion, Ex. F (Debtor Books and Records) at 3–5, 9, 11 (showing amounts owed by the Debtor in U.S. Dollars).

Seward and Kissel, Stanley could not produce invoices for "Fleming and White and Gander and Zulack";[26] and (iii) the Debtor and Affiliates could not identify (a) why Stanley was selected to pay the legal fees or the property taxes, (b) why the Debtor did not pay these amounts itself, and (c) why Stanley allegedly owed the Debtor funds.  *See* Objection at 7 (citing Fitzpatrick Tr. at 75:3–10, 76:4–6, 77:7–9, 78:19–24, 93:5–8, 96:6–14).

***Fine Art Claim: $712,858***

The Fine Art Claim is for (i) $458,931 paid to the DOJ to settle the civil forfeiture related to the dispute described above; and (ii) $253,927 to pay a broker's commission for procuring the Subtenant for the Premises.  Motion ¶ 27.  The Trustee asserts that the Debtor is entitled to an offset of $4,817 for its payment of Fine Art's storage expenses, so the "net amount claimed is $708,040."  *Id.*  The Fine Art Claim is not evidenced by a loan agreement.  In support of the Fine Art Claim, the Trustee cites to (i) an Excel spreadsheet entitled "Fine Art Creditor breakdown," summarizing these payments by Fine Art for the Debtor and the offset amount due to an advance by the Debtor on Fine Art's behalf;[27] (ii) the audited books and records of Fine Art;[28] (iii) the unaudited books and records of the Debtor;[29] and (iv) the fact that the debt is reflected as an undisputed general unsecured claim in the Debtor's Schedule E/F.  *Id.* ¶¶ 28–29.

---

[26] The Landlord has not explained how this entity relates to the Stanley Claim, but the Court notes that the Debtor listed "Fleming Zulack Williamson Zauderer" in its Schedule E/F as holding a nonpriority unsecured claim for $4,943.74 against the estate.  Schedule E/F.

[27] The Trustee asserts that the "Fine Art Creditor Breakdown" is included in Exhibit D to the Motion.  *See* Motion ¶ 28.  However, there is no document with that title in Exhibit D.  Only the document titled "Fine Art Auction Group—Amounts owed by Mallett Inc." on page 87 of Exhibit D describes the transactions between Fine Art and the Debtor that the Trustee references.  *See* Motion, Ex. D (Fine Art Books and Records) at 87.

[28] *See* Motion, Ex. D (Fine Art Books and Records) at 91–94 (showing amounts owed from the Debtor in British Pounds).

[29] *See* Motion, Ex. F (Debtor Books and Records) at 3–5, 9, 11 (showing amounts owed from the Debtor in U.S. Dollars).

In opposing the Motion, the Landlord asserts that the Fine Art Claim is not supported by a loan agreement or any documentation necessary to meet its "heavy burden." Objection at 7.

***Milsom Claim: $6,865,660***[30]

The Milsom Claim arises from three sets of loans that Milsom claims to have made to the Debtor, plus interest on the loans through the Petition Date. Two are supported by documents: (i) a Secured Revolving Credit Agreement dated January 1, 2003 (the "Secured Revolving Credit Agreement"); [31] and (ii) a Secured Promissory Note dated January 1, 2003 (the "Secured Promissory Note").[32] Motion ¶ 30.

The Secured Promissory Note is in the principal amount of $2.3 million. *Id.* ¶ 33. Advances under the note are payable on demand. *Id.* The loan is governed by New York law. *Id.* The Secured Revolving Credit Agreement provided the Debtor with cash advances to operate its showroom, to finance startup expenses, to acquire inventory, and to carry accounts receivable. *Id.* ¶ 31. The outstanding principal accrued interest at the applicable federal rate that was in effect on the first day of each calendar year. *See id.* ¶ 32 ("Outstanding principal accrued interest at the Applicable Federal Rate as published by the Commissioner of Internal Revenue under section 1274 of the Internal Revenue Code as in effect for the first day of each calendar year."). The Trustee says that (i) the largest amount that could be outstanding under the loan was $1.7 million, and (ii) Milsom and the Debtor assume that some portion of the $1.7 million was used to fund startup expenses. *Id.* The loan is payable on demand and is governed by New York law. *Id.*

---

[30] The parties to the loan documents are the Debtor and Mallett & Son (Antiques) Ltd., which later changed its name to Milsom Street Limited.

[31] A copy of the Secured Revolving Credit Agreement is annexed as part of Exhibit E to the Motion. Motion, Ex. E (Fine Art Books and Records) at 118–23.

[32] A copy of the Secured Promissory Note is annexed as part of Exhibit E to the Motion. Motion, Ex. E (Fine Art Books and Records) at 116–17.

The Trustee asserts that the books and records show a third debt from the Debtor to Milsom

in the amount of $1,053,912 that was not incurred under either the Secured Revolving Credit

Agreement or the Secured Promissory Note. *See id.* ¶ 34.

The Trustee asserts that the three purported loans are summarized in Exhibit E to the

Motion, an Excel spreadsheet entitled "Milsom Creditor breakdown." The amounts owed under

the loans increase for accrued interest but decrease between March 2018 and April 2020 for

payments made by the Debtor toward the purported loans.[33] *Id.* ¶ 35.

The Trustee also asserts that, during this period, the Debtor remitted to Milsom rent paid

by the subtenant to the extent it exceeded the rent that was due to the Landlord. *Id.* ¶ 35. Moreover,

in support of the Milsom Claim, the Trustee cites to (i) the indebtedness being listed as a debt

owed by the Debtor to Milsom in both Milsom's audited books and records[34] and the Debtor's

unaudited books and records;[35] and (ii) it being listed as a general unsecured claim in the Debtor's

Schedule E/F. *Id.* ¶ 37.

In opposing the Motion, the Landlord asserts that only two of the three loan agreements

are supported by a written loan agreement, and that the neither the Debtor nor Milsom produced

---

[33] Milsom represents that this document was kept in the regular course of business since at least January 2013. Although the document reflects interest accruing after the bankruptcy filing, Milsom claims the highlighted line with the amount due as of the bankruptcy filing only. As an unsecured creditor, Milsom concedes that is not entitled to be paid interest that accrued after the filing, and that amount is not included as part of its claim in the Schedules. *See* Motion ¶ 36. The Trustee asserts that the "Milsom Creditor Breakdown" is included in Exhibit E to the Motion. *See* Motion ¶ 35. However, there is no document with that title in Exhibit E. Only the document titled "MAS>MNY INTER-COMPANY—ACC 6230" on pages 99–100 of Exhibit E describes these balances, and these balances do not, when considered with the trading account between the Debtor and Milsom, decrease cumulatively between March 2018 and April 2020. *See* Motion, Ex. E (Milsom Books and Records) at 99–100.

[34] *See* Motion, Ex. E (Milsom Books and Records) at 105–107, 112 (showing amounts owed by the Debtor in British Pounds).

[35] *See* Motion, Ex. F (Debtor's Books and Records) at 3-5, 9, 11 (showing amounts owed by the Debtor in U.S. Dollars).

any source documentation, trading invoices, or payment history evidencing the debt.  *See* Objection at 6 (citing Fitzpatrick Tr. at 46:15–24, 47:9–12, 58:9–22, and 143:2–13).

<u>**Analysis**</u>

<u>**Applicable Legal Standard**</u>

"On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."  Fed. R. Bankr. P. 9019(a).  Compromises are favored in bankruptcy because they "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate."  *In re K.G. IM, LLC*, 620 B.R. 469, 483 (Bankr. S.D.N.Y. 2020); *see also Motorola, Inc. v. Off. Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 455 (2d Cir. 2007) (observing that "settlements . . . help clear a path for the efficient administration of the bankrupt estate, including any eventual plan of reorganization"). "A court must determine that a settlement under Bankruptcy Rule 9019 is fair, equitable and in the best interests of the estate before it may approve it."  *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640 (Bankr. S.D.N.Y. 2012).  The decision to approve or deny a "settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court."  *In re Genever Holdings, LLC*, No. 20-12411, 2021 WL 3919826, at *8 (Bankr. S.D.N.Y. Sept. 1, 2021).

In considering whether to approve a settlement or compromise, a court should apprise itself of all facts necessary for an informed and objective opinion of the probabilities of ultimate success should the claim be litigated, and "the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise."  *In re Matlin Patterson Glob. Opportunities Partners II L.P.*, 644 B.R. 418, 426 (Bankr. S.D.N.Y. 2022) (quoting *Protective Comm. for Indep.*

*Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).  In so doing, a

court need not decide the numerous issues of law and fact raised by a compromise or settlement,

"but must only 'canvass the issues and see whether the settlement falls below the lowest point in

the range of reasonableness.'"  *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr.

S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)).

In *In re Iridium Operating* ("*Iridium*"), the Second Circuit directed courts to balance seven

interrelated factors in determining whether a settlement is fair and equitable.  *See Iridium*, 478

F.3d at 462.  Those factors are as follows:

1. The balance between the litigation's possibility of success and the settlement's
   future benefits;

2. The likelihood of complex and protracted litigation, with its attendant expense,
   inconvenience, and delay, including the difficulty in collecting on the judgment;

3. The paramount interests of the creditors (including each affected class's relative
   benefits) and the degree to which creditors either do not object to or
   affirmatively support the proposed settlement;

4. Whether other parties support the settlement;

5. The competency and experience of counsel supporting, and the experience and
   knowledge of the bankruptcy court judge reviewing the settlement;

6. The nature and breadth of releases to be obtained by officers and directors; and

7. The extent to which the settlement is the product of arm's-length bargaining.

*Id.*  Below, the Court applies those factors to the Compromise.

## **Discussion**

### *Factor 1: Litigation's Possibility of Success and Settlement's Future Benefits*

The first *Iridium* factor requires the Court to contemplate the parties' respective

probabilities of success in an underlying litigation.  The court is not required to decide all of the

14

issues implicated by ongoing litigation or "to conduct a 'mini-trial'" of the dispute's facts or merits. *In re Adelphia Commc'n Corp.*, 327 B.R. at 159 (citing *In re Purofied Down Prod. Corp.*, 150 B.R. 519, 522 (S.D.N.Y. 1993); *In re Int'l Distribution Centers, Inc.*, 103 B.R. 420, 423 (S.D.N.Y. 1989)). It needs only to be apprised of the facts necessary to allow it to "evaluate the settlement and to make a considered and independent judgment about the settlement." *Id.* It may rely on the trustee's, parties', and attorneys' opinions to do so. *Id.*

The Landlord contends that the Court should deny the Motion and authorize the Landlord to prosecute objections to the Affiliate Claims. It contends that there is a high likelihood that it can successfully object to the Affiliate Claims because those claims are (i) insufficiently documented, (ii) are subject to a statute of limitations that has lapsed, and (iii) should be recharacterized as equity. Objection at 4–5, 7, 12. Accordingly, it argues that application of the first *Iridium* factor weighs against approving the Compromise. The Court considers these matters below.

Under section 502(a) of the Bankruptcy Code, "a claim . . . proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects." 11 U.S.C. § 502(a). As relevant, section 1111 of the Bankruptcy Code provides, in substance, that a proof of claim is deemed filed for any claim that appears in a debtor's schedules, except a claim that is scheduled as disputed, contingent, or unliquidated. *See* 11 U.S.C. § 1111(a). Creditors' claims that are listed in a debtor's schedules "constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated." Fed. R. Bankr. P. 3003(b)(1)

Section 502(b) sets forth the grounds for disallowing a proof of claim filed under section 501 of the Bankruptcy Code. *See* 11 U.S.C. § 502(b); *see also Travelers Cas. & Sur. Co. of Am.*

*v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 449 (2007) ("But even where a party in interest objects [to a claim], the court 'shall allow' the claim 'except to the extent that' the claim implicates any of the nine exceptions enumerated in § 502(b)." (quoting 11 U.S.C. § 502(b))).   Section 502(b) prescribes nine categories of claims that will be disallowed.   11 U.S.C. § 502(b).   As relevant, section 502(b) provides that the Court shall determine and allow the amount of a claim subject to an objection as of the bankruptcy petition date "except to the extent that . . . (1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ."   11 U.S.C. § 502(b)(1).

When a claim is supported by prima facie evidence, "[a] party objecting to . . . [the] claim has the initial burden of going forward with evidence to refute the claim even though the creditor retains the ultimate burden of persuasion with regard to the validity of the claim." *In re Live Primary, LLC*, 626 B.R. 171, 188 (Bankr. S.D.N.Y. 2021).   If an objection filed pursuant to section 502(b)(1) refutes, with "evidence equal in force to the prima facie case," at least one of the claim's essential allegations, then the burden shifts to the claimant to demonstrate the validity of the claim. *In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009) (quoting *In re Allegheny Intern., Inc.*, 954 F.2d 167, 173–74 (3d Cir. 1992)).   At that point, the claimant "must then prove by a preponderance of the evidence that under applicable law the claim should be allowed." *Id.*

The Landlord argues that since the Affiliates are insiders, they have a "high burden" to establish that their claims are valid. *See* Objection at 5–6 (collecting cases addressing heightened scrutiny for insiders and arguing that "[t]he [Affiliates]' claims largely lack any documentation whatsoever, confirming that they should be disallowed as the [Affiliates] cannot meet their high burden of establishing the validity of the claims").   Second, the Landlord says, as to each

16

component of the Affiliate Claims, that the lack of supporting documentation means that the Affiliates cannot meet their so-called "high burden."[36]

The Court is unconvinced that the Affiliates, even if insiders, have a higher burden to support their claims than any other creditor.  If that burden is indeed higher, it is only so "once the prima facie validity of their claims is rebutted." *In re Scheidmantel Olds-Cadillac, Inc.*, No. 92-21270, 1994 WL 386855, at *2 (Bankr. W.D. Pa. July 12, 1994).  To hold otherwise would be to contravene Fed. R. Bankr. P. 3003(b)(1), which requires the Court to consider creditors' claims that are listed in a debtor's schedules as "prima facie evidence of [their] validity and amount . . . ."  For that reason, the Court will proceed by assessing a hypothetical objection to the Affiliate Claims under its ordinary burden-shifting framework.

Sufficiency of Documentation

The Affiliate Claims appear on the Debtor's schedules as claims that are non-contingent, liquidated, and undisputed.  This fact establishes their prima facie validity, and the Landlord bears the burden of coming forward with evidence that would demonstrate that the claims should not be allowed.  Despite the Landlord's argument that the Affiliates have not supported their claims with sufficient evidence, nor met their burden to establish their claims' validity, *see* Objection at 6–7, the Landlord does not put forth evidence that would refute the prima facie validity of the Affiliate

---

[36] More specifically, the Landlord argues that the Affiliate Claims are invalid because: (i) the $72,410.00 Dover claim lacks a loan agreement and the Debtor nor the Affiliates can provide "source documents" to establish the validity of the debt, Objection at 6; (ii) the $6,865,660.00 Milsom claim (beyond a note and revolver agreement) lacks a loan agreement, the Debtor and the Affiliates do not know how the funds were used, and the exchange of funds and the alleged debt related to a "trading invoice" have not been substantiated by "source documents," *id.*; (iii) the $3,959,176.00 Octagon claim lacks a loan agreement, there is no evidence of any payments made by the Debtor towards the alleged debt, and there are no "source documents" supporting the debt, *id.*; (iv) the $274,505.00 Stanley claim is not supported by a loan agreement, and the Affiliates have not produced invoices or provided satisfactory explanations for why certain payments were made by Stanley, *id.* at 7; and (v) the $712,858.00 Fine Art claim lacks a loan agreement, *id.*

Claims. Instead, the Landlord argues that the Affiliate Claims are not supported by evidence sufficient to establish that they are valid.

The Landlord argues that the Trustee would likely succeed on objecting to the Affiliate Claims based on their alleged lack of documentation, which is essentially a challenge to their prima facie validity. The Court disagrees that such an objection would likely succeed.

Section 502(b) enumerates nine grounds on which courts may disallow a claim. 11 U.S.C. § 502(b)(1)–(9). Lack of documentation is not among the enumerated grounds to disallow a claim under 11 U.S.C. § 502(b). Nonetheless, on various theories, courts often find that disallowance for lack of documentation is among the grounds stated in section 502(b), even though it is not listed there explicitly. *See In re Minbatiwalla*, 424 B.R. 104, 118–19 (Bankr. S.D.N.Y. 2010) (discussing various approaches to resolving insufficient-documentation objections). For the purpose of determining the likelihood of success of a hypothetical claim objection, the Court will assume, without deciding, that an objection to the sufficiency of the Affiliate Claims would embrace one of the grounds enumerated in section 502(b).

A challenge based on the sufficiency of the documentation supporting the Affiliate Claims would be likely to fail. At the outset, the Affiliate Claims must be presumed to be supported by prima facie evidence of their validity and amount by virtue of their inclusion on the Debtor's schedules. Fed. R. Bankr. P. 3003 ("The schedule of liabilities filed pursuant to § 521(1) of the Code shall constitute prima facie evidence of the validity and amount of the claims of creditors, unless they are scheduled as disputed, contingent, or unliquidated."). As this Court has observed, "[a] debtor's scheduling of a debt constitutes a sworn statement and admission against interest, which is strongly probative of the claim's validity." *In re Live Primary, LLC*, 626 B.R. at 189. The Debtor's scheduling of the Affiliate Claims is likewise probative of their validity here. The

Affiliate Claims here are also supported by more than the Debtor's say-so; the Affiliates also offer their books and records to demonstrate that they have long carried balances based on money transferred to the Debtor. Spreadsheets track the money lent between the Debtor and the Affiliates across the Affiliates' audited and the Debtor's unaudited financial statements.

This evidence appears likely to withstand a challenge based on the sufficiency of the documentation supporting the Affiliate Claims. Moreover, the evidence upon which the Trustee now relies to support the proposed Compromise is the same evidence upon which the Affiliates would likely rely to support their claim. Under the burden-shifting framework, the Landlord, as the party objecting to the Affiliate Claims, would need to come forth with evidence equal in force to that which the Affiliates would present in support of the Affiliate Claims before the burden would shift back to the Affiliates. *In re Oneida, Ltd.*, 400 B.R. at 389. The Landlord has not stated what evidence could be offered to overcome this burden. The Court cannot agree that it is likely that the Trustee would succeed in challenging the Affiliate Claims based on a challenge to the adequacy of documentation supporting them.

Statute of Limitations

The parties do not dispute that the Affiliate Claims are subject to a six-year statute of limitations. The Landlord contends that application of the statute of limitations bars at least $10,802,511.00 of the Affiliate Claims because the purported debt underlying the Dover Claim, portions of the Octagon Claim, and portions of the Milsom Claim arose over six years prior to the Petition Date. Objection at 9. The Trustee disputes that contention. She says that the statute of limitations has been restarted by the Debtor's "multiple written acknowledgments regarding the validity of the Affiliate Claims" and its partial payments on account of the Affiliate Claims. Trustee Reply ¶ 22. Likewise, the Affiliates argue that the common law partial payment and

acknowledgment exceptions toll the statute of limitations.  Affiliate Reply ¶¶ 32–36.  They say that both the Affiliates' and the Debtor's financial statements tracked the reductions and increases in the intercompany debt throughout the limitations period.  *Id.* ¶ 35.

Annually, through the fiscal year ended March 31, 2021, and specifically within the six-year limitations period prior to the Petition Date, the Debtor prepared regular financial statements for the Affiliates and other Group members.  These statements were used for managerial decisions and planning within the Stanley Gibbons Group.  Fitzpatrick Dec. ¶ 2.  In 2018, the accounting functions for the Group—including the Debtor—were centralized.  *Id.* ¶ 3.  This meant that the accounting team prepared both the Debtor's and the Affiliates' financial statements.  *Id.* ¶ 3.  The auditors of the Group members based in the United Kingdom used these financial statements to verify intercompany debts, including those allegedly owed by the Debtor to the Affiliates.  *See id.* ¶ 5.

The Fitzpatrick Declaration details the transactions between the Debtor and its Affiliates as follows:

- For Milsom, "[t]he financials for both entities reflect an active relationship between the Debtor and Milsom throughout the Limitations Period (and presumably much longer). Such movement on the month-to-month balances indicates payments and other transactions (e.g., accrual of interest) between these entities."  Fitzpatrick Dec. ¶ 7.

- For Dover, Dover's balance sheets and financial statements for the years ended 2019–21 and the Debtor's financials "show a balance reduction within the Limitations Period between 2015 and 2016, which was likely a result of a payment from the Debtor."  *Id.* ¶ 8.

- For Octagon, "Octagon and the Debtor had an active trading relationship in the years while the Debtor's antique business was operating and liquidating; i.e., up to 2018 when the Debtor stopped all antique business trading and deregistered for payroll purposes. These transactions were likely a mix of purchases and payments."  *Id.* ¶ 9.

- For Stanley and Fine Art, "[a]s shown in the financials attached to the Settlement Motion, which are limited to fiscal years ending March 31, 2019, 2020 and 2021, the Claims of Stanley and Fine Art[] arose after 2018." *Id.* at 4 n.4.

According to the Affiliates, these consistent accounting adjustments demonstrate that the Debtor intended, and the Affiliates expected, that the debt would remain owing. *Id.* The Affiliates also say that the Debtor's inclusion of the Affiliate Claims on its bankruptcy schedules indicates its intent to pay the intercompany debts. Affiliate Reply ¶ 10.

The Landlord argues that the common law exceptions do not toll the six-year limitations period. The Landlord asserts that there were likely no payments made on the alleged debts during the six-year period preceding the Petition Date. Opposition at 10. It says that even if partial payments were made within that period, there is no evidence of an absolute, unqualified acknowledgment that more was due, or any promise to pay the remainder. *Id.* at 11. The Landlord says that this argument is bolstered by the fact that the Affiliates listed the debts as "impaired" during this period on their financial statements, indicating they did not expect them to be recoverable "within the near term or next year." *Id.* at 11, 21. The Landlord also asserts that any acknowledgment or new promise to revive a debt barred by the statute of limitations must be in a writing signed by the party to be charged—here, the Debtor—and that was not done in this case. *Id.* at 11.

Under New York law, a debtor's partial payment or acknowledgment of a debt may toll the six-year statute of limitations for breach of contract. A debtor's partial payment tolls the statute of limitations when (i) it pays "a portion of an admitted debt"; (ii) the payment is "made and accepted as such"; and (iii) the circumstances show the debtor's "absolute and unqualified acknowledgment" that it still owes more, such that "a promise may be inferred to pay the

remainder." *Erdheim v. Gelfman*, 757 N.Y.S.2d 320, 322 (App. Div. 2003) (quoting *Morris Demolition Co. v. Bd. of Ed. of New York*, 355 N.E.2d 369, 371 (N.Y. 1976)). Alternatively, an acknowledgement of the debt will toll the statute of limitations when it is (i) signed by the debtor, (ii) acknowledges the existence of a debt, and (iii) says nothing that calls the debtor's intent to pay into doubt. *Id.*

Fitzpatrick testified that the last time the Debtor made a payment toward the debt to Dover was during the financial year ending March 2016. Fitzpatrick Tr. at 34:8–11. Moreover, he indicated, when asked whether at least a portion of the Milsom debt was repaid, that the trading balance went from positive to negative from 2013 onward, and that a portion of the trading balance was repaid, but not the revolver or note. *Id.* at 59:5–14.

The Affiliates argue that the Debtor acknowledged the Dover Claim, Octagon Claim, and Milsom Claim in the financial statements that the Debtor provided to the Affiliates annually and in its schedules. The Landlord argues that listing the claims in the schedules did not toll the statute of limitations and, as support, it relies on *U.S. Bank Nat'l Ass'n as Tr. for JPMorgan Mortg. Tr. 2006-6 v. Caruana*. Opposition at 11. In that case, the First Department held that a "bankruptcy petition did not satisfy either [tolling] provision, because it merely listed the mortgage debt at issue, neither expressly acknowledging the debt nor promising to pay it." 132 N.Y.S.3d 286, 286 (App. Div. 2020). The Affiliates argue that scheduling a debt constitutes an intent by the Debtor to keep repaying the Claims. Affiliate Reply ¶¶ 28–29.

It is not clear under what circumstances, if any, scheduling a debt might toll the statute of limitations. Because the First Department's decision in *Caruana* contained little explanation why the mere "listing" of the debt at issue and "checking a box" stating that real property would be "retained and kept current" was insufficient to trigger the exception, it is difficult to understand

what more, if anything, beyond including a debt on a debtor's schedules would toll the statute of limitations. New York's highest court has not passed on the issue, so the Court gives "proper regard" to the First Department's decision, given the apparent dearth of contrary authority, by assuming that the Debtor's scheduling of the Affiliate Claims does not toll the statute of limitations. *Santalucia v. Sebright Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000) (quoting *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994)).

The Landlord asserts that the inclusion of the Affiliate Claims on the Debtor's financial statement is not an acknowledgement of the debt sufficient to toll the statute of limitations. As support, it relies on *Shelley v. Dixon Equities*, 752 N.Y.S.2d 542 (App. Div. 2002). In that case, the Appellate Division rejected a claim that financial records containing a balance sheet and reconciliation of cash receipts and disbursements tolled the statute of limitations as a written acknowledgement. *Id.* at 543. However, the financial statements there were not prepared or signed by the Debtor, but were instead reconstructed by a creditor. *Id.* Here, the Debtor produced its own unaudited financial statements.

In *Daewoo*, the district court found that an acknowledgement on the company books is sufficient to toll the statute of limitations. *Daewoo Int'l (Am.) Corp. Creditor Tr. v. SSTA Am. Corp.*, No. 02-9629, 2004 WL 1488511, at *4 (S.D.N.Y. 2004). Here, the alleged debts were carried on the Debtor's books. Moreover, they were prepared for the purposes of the Affiliates' audits, making clear that the Debtor intended to communicate the acknowledgment to the Affiliates. *Cf. Lynford v. Williams*, 826 N.Y.S.2d 335, 337 (2d Dep't 2006) (a written acknowledgment does not restart the statute of limitations under § 17–101 if it was not "communicated to the plaintiff or to anyone on his behalf, nor intended to influence the plaintiff's conduct in any manner"); *In re Brill*, 318 B.R. 49, 60 (Bankr. S.D.N.Y. 2004) ("When the debtor

acknowledges the existence of the debt to a stranger, the acknowledgment will be effective if it appears that it was the intention of the debtor that the acknowledgment should be communicated to and should influence the creditor."). It is not clear, from the record, that the acknowledgment was ever delivered to the Affiliates with a signature. *See Erdheim*, 757 N.Y.S.2d 322. However, the import of this fact is complicated by the fact that in 2018, the Debtor's accounting functions were centralized such that there might be nothing for the debtor to sign and deliver, as is so in much of the case law interpreting and applying this doctrine. The Court need not definitively consider this issue for the purpose of resolving this motion beyond determining that it is unlikely that an objection to the Claim would be successful on a statute-of-limitations ground.

Recharacterization

Recharacterization of a claim from debt to equity "is appropriate where the circumstances show that a debt transaction was actually an equity contribution *ab initio*." *In re Live Primary, LLC*, 626 B.R at 178 (quoting *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 747–48 (6th Cir. 2001) ("*AutoStyle*")). In determining whether an investment that purports to be debt should be recharacterized as equity, courts in this district have generally followed the eleven-factor *AutoStyle* analysis. *See, e.g.*, *In re Lyondell Chem. Co.*, 544 B.R. at 93; *In re Aéropostale, Inc.*, 555 B.R. 369, 420–21 (Bankr. S.D.N.Y. 2016); *In re Sabine Oil & Gas Corp.*, 547 B.R. 503, 566 (Bankr. S.D.N.Y. 2016), *aff'd*, 562 B.R. 211 (S.D.N.Y. 2016). Those factors are:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims

of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*AutoStyle*, 269 F.3d at 749–50.  No factor is conclusive and "[t]he factors must be considered within the particular circumstances of each case."  *Id.*  Thus, a bankruptcy court can recharacterize a claim as equity even if fewer than all of the factors weigh in favor of recharacterization.  *In re Lyondell Chem.*, 544 B.R. at 94.  The ultimate question for the court is "whether the parties called an instrument one thing when in fact they intended it as something else. . . . Answers lie in facts that confer context case-by-case."  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2005).  In that light, "the paradigmatic situation for recharacterization [is] where the same individuals or entities (or affiliates of such) control both the transferor and the transferee, and inferences can be drawn that funds were put into an enterprise with little or no expectation that they would be paid back along with other creditor claims."  *Adelphia Commc'ns Corp. v. Bank of America, N.A. (In re Adelphia Commc'ns Corp.)*, 365 B.R. 24, 74 (Bankr. S.D.N.Y. 2007).

The Landlord argues that the Trustee has not properly examined whether the Affiliate Claims should be recharacterized as equity.  Objection at 12.  It says that application of the *AutoStyle* factors in this case weighs in favor of recharacterization.  Accordingly, it contends that the Compromise is unreasonable and must be rejected.  *Id.*  It claims that the Affiliates have failed to provide information or documents which would refute the *AutoStyle* factors, and that the Court should not require the Landlord to prove that the factors are satisfied while the Affiliates withhold the information necessary to demonstrate the indebtedness that purportedly underlies the Affiliate Claims.  *Id.* at 14.

The Trustee doubts whether she could maintain a nonfrivolous claim against the Affiliates for recharacterization of the Affiliate Claims for three reasons. Motion ¶ 59. First, she contends that the *AutoStyle* factors do not point to recharacterization, if they apply at all. Motion ¶¶ 43–53. Second, she contends that the factors would only apply to a portion of the alleged Milsom debt, because "In [*In re LATAM Airlines Grp. S.A.*,], as here, most of the loans are not eligible for recharacterization because they were not made at the time that the borrower affiliate was formed." Motion ¶¶ 53, 56 (citing *In re LATAM Airlines Grp. S.A.*, 2022 WL 1295928, No. 20-11254 (Bankr. S.D.N.Y. April 29, 2022)). Finally, she notes that the Second Circuit has not ruled on the authority of bankruptcy courts to recharacterize debts under the Bankruptcy Code, and if the Court applied New York state law to the debt recharacterization analysis, it must construe the debt underlying the Affiliate Claims as such. *Id.* ¶¶ 55, 59.

On the first and second points, the Trustee misconstrues the Court's decision in *In re LATAM*. There, the Court declined to apply the *AutoStyle* factors because it was determining the validity of a claim, and not whether it should be recharacterized. *See In re LATAM*, 2022 WL 1295928, at *9 ("The Committee disclaims any effort to recharacterize the Intercompany Loans."). In *In re LATAM*, the Court found that the *AutoStyle* factors were inapposite because they did not resolve the issue of whether intercompany loan agreements gave rise to enforceable debts under New York law. *Id.* at *12. The Court also found no state-law precedent in applying the *AutoStyle* factors to assess the so-called "real character" of a purported loan agreement. *Id.* The challenge is different here; the issue in a hypothetical claim objection would be whether the Trustee could show that the Affiliates and the Debtor intended the purported debt as equity. *See In re SubMicron Sys. Corp.*, 432 F.3d 448, 455–56 (3d Cir. 2006) ("While these tests undoubtedly include pertinent factors, they devolve to an overarching inquiry: the characterization as debt or equity is a court's

attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else.").

As to the third factor, it suffices to say, in summary, that "there can be little doubt that bankruptcy courts have the power to recharacterize debt as equity when such is warranted by the facts." *In re Lyondell Chem. Co.*, 544 B.R. at 93. Accordingly, the Court addresses the *AutoStyle* factors below.

Factor 1: The Names Given to the Instruments, Assuming Any Exist: The Trustee argues that the Milsom Loans are labeled as debt instruments and that the loan documents have payment terms and "other typical loan agreement clauses." Motion ¶ 43. She also argues that the audited financial statements provided by the Affiliates and the unaudited financial statement of the Debtor reflect the Milsom Loans as debt and that the Affiliates' books and records do not demonstrate that the Milsom Loans conferred any rights that are typically associated with ownership. *See id.*

The Landlord argues that, beyond the Secured Revolving Credit Agreement and Secured Promissory Note, which cover approximately $4 million of the total Affiliate Claims, none of the other alleged debts are documented with loan documents. *See* Objection at 14–15. The Landlord maintains, given that most parts of the Affiliate Claims are undocumented,[37] there is a strong indication that they were capital advances. *See id.* at 15 (citing *In re Live Primary*, 626 B.R. at 198–99).

The names of the instruments in the record are not consistent with an equity investment. They do not have the features of an equity investment such as the conferral of voting rights,

---

[37] "Notably, Debtor and the [Affiliate] Creditors confirmed that none of the alleged debt beyond the Note and Revolver were confirmed by a written agreement." Objection at 15 (citing Fitzpatrick Tr. at 31:12–15, 47:9–12, 58:9–22, 68:16–20, 78:19–24, 85:4–9, and 143:2–13).

redemption rights, or dividends.  As for the remaining agreements, given the Landlord's failure to demonstrate that the parties referred to them as something other than loans, this factor does not support recharacterization.

Factor 2: Presence of a Fixed Maturity Date and Schedule of Repayments: The Trustee asserts that, under this factor, courts have held that loans may contain a demand feature instead of a fixed maturity date.  Motion ¶ 43 (citing *In re Lyondell Chem.*, 544 B.R. at 95 ("this Court has never seen a revolver that was anything other than a loan.")).  The Affiliates echo that argument. *See* Affiliate Reply ¶ 45.[38]

The Landlord analogizes the loans here to those that were at issue in *In re Live Primary*. Objection at 17.  In that case, the Court found that the fact that a purported loan had no fixed maturity date indicated that it was not a loan at all, but an investment, since no reasonable lender would loan over six million dollars in unsecured advances to a startup without a fixed maturity date.  *In re Live Primary, LLC*, 626 B.R. at 200.  Furthermore, while the Trustee and Affiliates contend that the debts were payable on demand, the Landlord argues that neither the Debtor nor the Affiliates could provide an example of a demand for payment.  *See id.* (citing Fitzpatrick Tr. at 35:9–11, 49:1–4, 51:8–11, 55:1–5, 70:25–71:7, and 80:4–8).  The Affiliates argue that in *In re Live Primary*, the financing was a part of an operating agreement, which tends to demonstrate that the financing pointed towards ownership.  *See* Affiliate Reply ¶ 46.

The Court does not consider whether the Affiliates ever made a demand for payment especially probative in determining whether the parties intended a debt or equity relationship at

---

[38] Although loans payable on demand are not invalid for that fact, *Elia v. Perla*, 55 N.Y.S.3d 305, 307 (App. Div. 2017), this point distracts from the relevant issue on recharacterization.  This factor does not address whether the purported loans are valid as a matter of law—which is governed by section 502(b)(1) of the Bankruptcy Code—but whether they were intended as loans.

the inception of each agreement, given that the Debtor appears to have made some repayments.[39]

However, there appears to have been no fixed maturity date nor a schedule for repayments, which are features of loans but not investments. The Court agrees that where a purported loan refers to itself as a revolving credit loan, this factor "hardly weighs in favor of recharacterization." *See In re Lyondell Chem. Co.*, 544 B.R. at 95. Fixed maturity dates and repayment schedules not being features of equity do not always mean that they must be features of a loan. If they were, this would mean that the ordinary revolver loan, which indisputably creates a lender-borrower relationship, would by its nature start with a point in the equity column under the *AutoStyle* analysis. Nonetheless, the exception should not swallow the rule; as to the purported loans which were not documented as revolver loans, or documented at all, this factor must support recharacterization because the Court has no terms by which it can infer that the financing was intended as a revolver by the Debtor and each respective Affiliate by whom it was financed. For that reason, this factor supports recharacterization as to the Affiliate Claims not supported by loan agreements and the Secured Promissory Note, but not the Secured Revolving Credit Agreement, where it is inapplicable.

Factor 3: The Presence or Absence of a Fixed Rate of Interest and Interest Payments: The Trustee asserts that the Secured Revolving Credit Agreement and Secured Promissory Note contain interest rate terms, and that the interest rate varied between 1% and 3.45% from 2013 to 2020. Motion ¶ 44. The Landlord contends that, aside from those Milsom loans, none of the other debt bears an interest rate. *See* Objection at 18. Further, it argues that the actual rate on the Milsom

---

[39] Neither the Debtor nor the Affiliates knows whether the alleged debts underlying the Milsom Claim, the Octagon Claim, or the Dover Claim were ever the subject of a demand for payment by Milsom, Octagon, or Dover, respectively. Fitzpatrick Tr. 49:1–4, 51:8–11, 55:1–5, 70:25-71:7, 80:4–8.

Loans was *de minimis*. *Id.* According to the Landlord, there is no evidence that the Debtor paid any of the yearly interest payments required by the purported loans made by Milsom. *See id.*

The Affiliates concede that, outside of the Secured Revolving Credit Agreement and Secured Promissory Note, the terms of the intercompany debts did not charge an interest rate. Affiliate Reply ¶ 47.

The only issue with which the Court is concerned for purposes of applying this factor is whether there was a fixed rate of interest and interest payments. The Secured Revolving Credit Agreement and Secured Promissory Note bore interest rates that fluctuated between 1% and 3.45% from 2013 to 2020. Motion ¶ 44. The other purported loans underlying the Affiliate Claims do not charge interest at all. Except as to the Secured Revolving Credit Agreement and Secured Promissory Note, this factor supports recharacterization.

Factor 4: Expected Source of Repayment: The Trustee argues that no term in the Milsom documents conditions repayment on the Debtor's financial success. *Id.* ¶ 45 (citing *AutoStyle*, 269 F.3d at 751 ("[I]f the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.")). The Trustee maintains that the Debtor's repayments "show expectation of repayment." *Id.*

The Landlord argues that Mr. Fitzpatrick's testimony that "any income Debtor received would be used to 'pay the landlord'" before the Affiliates demonstrates that the source of Debtor's repayments were its profits. *See* Objection at 19. The Affiliates disagree, maintaining that the testimony does not demonstrate that the Affiliates would be paid only from the Debtor's profits. Affiliate Reply ¶ 48. They contend that by paying the Landlord before the Affiliates, the Debtor was merely saving itself from the potential for eviction. *Id.*

The Landlord's argument does not demonstrate how the Debtor's subtraction of the rent from its revenue yields Debtor's "profits."  Moreover, the documents underlying Milsom's portions of the Affiliate Claims do not condition repayment on the Debtor's financial success, nor has the Landlord shown that any other alleged debts underlying the Affiliate Claims were conditioned on the Debtor's financial success.  This factor does not support recharacterization.

Factor 5: Adequacy of Capitalization: The Trustee concedes that there is no evidence that the Debtor was adequately capitalized in 2003 when the Secured Revolving Credit Agreement and Secured Promissory Note were executed.  Motion ¶¶ 30, 46.  However, she claims that the Debtor remained in business throughout the Great Recession and that the Landlord was willing to extend it credit, in the form of the Lease, without any guaranties from the Affiliates, which suggests that the Debtor was adequately capitalized.  *See id.* ¶ 46.[40]

The Landlord maintains that the evidence shows that the Debtor was inadequately capitalized in 2003.  The Landlord maintains that the Debtor's incorporation documents demonstrate an inflow of $500,000 in share capital.  Objection at 20 (citing D'Artiglio Decl., Ex. B.).  The Landlord contends, following that inflow, that the Debtor had an immediate need for an infusion of capital from Milsom so that it could commence operations.  *Id.*  The Landlord also asserts that the Debtor suffered losses for the fiscal years ending March 2015 to March 2017, which supports the argument that the Debtor was undercapitalized and needed the Affiliates' financial support.  *See id.* at 20–21.

---

[40] The Court need not address this argument at length except to note that the Court does not consider a lease payable in monthly installments as being necessarily indicative of the adequacy of a lessee's capitalization.  *See* Landlord Claim, Ex. B (Indenture).  A lessor's risk in such a situation is limited by its right to reenter and relet the premises in the event of a missed payment, rendering the lessee's capitalization less relevant to a lessor when compared to a lender making a long-term loan in a lump-sum which the Debtor may have spent by the time repayment is due.

The Affiliates disagree that the evidence demonstrates that the Debtor was inadequately capitalized. Affiliate Reply ¶¶ 50–51. They note that although the Landlord asserts that the Debtor needed a line of credit after receiving an inflow of $500,000, the Debtor has not demonstrated that line of credit was immediately drawn upon. *Id.* ¶ 50.

The relevance of this factor is most pronounced when "a corporation is started by the shareholders with a minimal amount of capital who then make a large loan of money to the newly formed corporation." *AutoStyle*, 269 F.3d at 751 (quoting *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 917 (Bankr. E.D. Va. 1997)). Though whether the Debtor remained in business long after its formation in 2001 may be relevant to determining the capital adequacy of the Debtor in general, in line with *AutoStyle*, the Court places particular emphasis on the adequacy of the Debtor's capitalization at its formation. On this point, the Landlord has not supported its claim that the Debtor could not have begun operations without financing from Milsom. This factor weighs against recharacterization.

Factor 6: Identity of Interest with the Debtor: The Trustee says that the Affiliates and the Debtor are affiliates of the Stanley Gibbons Group, and that Milsom is the direct parent to the Debtor. The Trustee argues that affiliation alone is insufficient to recharacterize a debt as equity. *See* Motion ¶ 47 (citing *Fairchild Dornier GmbH v. Off. Comm, of Unsecured Creditors (In re Official Comm, of Unsecured Creditors for Dornier Aviation (N. Am.), Inc.)*, 453 F.3d 225, 234 (4th Cir. 2006)). On the basis of this concession, the Landlord asserts that the parent-subsidiary relationship establishes that this factor favors recharacterization. *See* Objection at 21.

The Affiliates argue that "mere affiliation" is insufficient to warrant recharacterization, even where there is a showing of undercapitalization. Affiliate Reply ¶ 52. The Affiliates also assert that unless they "made advances in proportion to their respective stock ownership, 'this

factor is largely inapplicable.'"  *Id.* ¶ 53 (quoting *In re Lyondell Chem.*, 544 B.R. at 98).  The

Affiliates argue that they did not because "Milsom was and is the 100% owner of the Debtor, and

the Claims are spread out among all five Affiliates, and clearly not in proportion to their ownership

in the Debtor." *Id.* ¶ 53.

As a preliminary matter, the record on the ownership structure of the Affiliates is

contradictory and to some extent, internally inconsistent.  The Debtor says that "Milsom was the

direct parent of the Debtor."  Motion ¶ 47.  Yet, the Petition lists Octagon as the Debtor's sole

shareholder.  Petition ¶ 28, at 26.  Mr. Fitzpatrick confirms that Octagon, and not Milsom, is the

Debtor's parent.  Fitzpatrick Tr. 30-1:7, 68:6-10.  The Affiliates say in one paragraph that

"Octagon is the 100% owner of the Debtor" and in the next that "Milsom was and is the 100%

owner of the Debtor . . . ."  Affiliate Reply ¶¶ 52–53.  The Debtor, in Schedule G to its 2019

Corporate Tax Returns, lists Dover, Fine Art, the Stanley Gibbons Group, and "Noble Investments

(UK) Ltd." each as 100% owners of the Debtor's voting stock.  Neither the Trustee or the Affiliates

attempts to explain these apparently contradictory assertions through an organizational chart or

otherwise.

That said, the record is clear that the Affiliates do not all hold ownership interests in the

Debtor.  In *In re Lyondell Chem.*, the funds at issue all came from the controlling shareholder of

the debtor.  *In re Lyondell Chem.*, 544 B.R. at 98.  The Court held that this factor was "largely

inapplicable, because it applies most obviously when several stockholders extend the funds, and

one can measure the proportion of the contribution of each against the stock ownership of each."

*Id.*  That is not the case here.  The Affiliate Claims consist of multiple purported loans to the

Debtor, but the Affiliates do not all own stock in the Debtor.  For that reason, the import of this

factor is attenuated, and since this fact renders the Court unable to measure the "contribution of

each against the stock ownership of each," *see In re Lyondell Chem.*, 544 B.R. at 98, this factor does not support recharacterization.

Factor 7: Security for Advances: The Trustee asserts that this factor weighs against recharacterizing the alleged debt because the Milsom debt is secured.[41]  *See* Motion ¶ 48 (citing *AutoStyle*, 269 F.3d at 752).  Moreover, she maintains that normal intercompany trade debt is typically unsecured.  *Id.*  The Affiliates make similar arguments.  *See* Affiliate Reply ¶ 55.

This factor weighs against recharacterizing the Secured Revolving Credit Agreement and Secured Promissory Note.  As for the portions of the Affiliate Claims that are unsecured, the Court agrees with the reasoning articulated in *In re Lyondell Chem.*:

> [T]he *AutoStyle* court . . . may have spoken more broadly than it intended . . . . When loans are made on an unsecured basis, they are much easier to recharacterize than secured loans, and deserve higher scrutiny . . . . But bona fide loans have been made on an unsecured basis for decades . . . and the fact that they were made without security cannot be regarded as a "strong indication" that loans documented as such were really "capital contributions rather than loans."

*In re Lyondell Chem.*, 544 B.R. at 98.   For that reason, this factor does not support recharacterization with respect to those portions.

Factor 8: Debtor's Ability to Obtain Outside Funding: The Trustee argues that no evidence demonstrates that the Debtor obtained financing from any source aside from the Landlord, who has extended credit to the Debtor, as evidenced by the Lease, without the benefit of any Affiliate guarantees.  *See* Motion ¶ 49; Affiliate Reply ¶ 56.  Likewise, the Affiliates argue that the Landlord has not produced any evidence that the Debtor did not or could not obtain outside funding and therefore cannot carry its burden of proof.  *See* Affiliate Reply ¶¶ 56–57.

---

[41] The Debtor scheduled Milsom's claim as an unsecured claim.  *See* Schedules E/F.

The Landlord argues that no reasonable creditor would have agreed to the terms of the purported loans by Milsom, which lacked a repayment schedule and bore an unusually low interest rate. *Id.* Likewise, as for the remaining purported loans, the Landlord argues that a reasonable creditor would not have agreed to make those loans because they lacked an interest rate and were also without defined payment schedules. *Id.*

The Landlord has not shown that a term making a debt payable on demand is one to which no reasonable outside lender would agree. However, the Court agrees that a reasonable outside lender, all else being equal, would not have agreed to make loans that lacked any documented terms. Though the Secured Revolving Credit Agreement and Secured Promissory Note bear interest rate terms, they lack payment schedules, late fees, and other features of a conventional commercial loan agreement. This factor supports recharacterization.

Factor 9: Extent That Advances Were Subordinated to Other Creditors: The Trustee asserts that there is "nothing to show that the advances made by any of the Affiliates were subordinated to other creditors, which weighs in favor of a debt determination." Motion ¶ 50. The Landlord does not address this factor.

This factor does not support recharacterization.

Factor 10: Extent That Advances Were Used to Acquire Capital Assets: The Trustee argues that the Debtor did not list any capital assets in its Petition, that its business is not capital intensive, and that the Secured Revolving Credit Agreement requires that the loans thereunder be used for operations. *See* Motion ¶ 51.

The Landlord argues that Fine Art's payment of the broker commission for the Sublease has the character of a start-up cost, as does the financing provided by Milsom, since the Secured

Revolving Credit Agreement says the funds are to be used to start up the showroom.  *See* Objection

at 23.  The Affiliates maintain that the Landlord has not met its burden on this factor because it

has not demonstrated that the Debtor purchased any capital asset on account of any of the debts.

Affiliate Reply ¶ 59.

A capital asset is "[a] long-term asset used in the operation of a business or used to produce

goods or services, such as equipment, land, or an industrial plant."  *Asset*, Black's Law Dictionary

(11th ed. 2019).  An operating lease is not a capital asset, and the Landlord has not pointed to any

capital assets which could support this factor.  This factor weighs against recharacterization.

Factor 11: Whether There Was a Sinking Fund to Provide Repayments: Both the Trustee

and the Landlord concede that there is no evidence of a sinking fund; the Trustee argues that this

fact should not favor a finding of equity, and the Landlord argues that it should.  *Compare* Motion

¶ 52, *with* Objection at 24.

In *In re Lyondell Chem.*, the Court questioned the continued relevance of this factor.  544

B.R. at 101.  The Court's experience led it to the conclusion that sinking funds were not as common

in modern corporate finance as they might have been in the past, and it would require some other

evidence before deciding that the lack of a sinking fund was meaningful in determining that its

absence pointed toward a finding of equity.  *Id.*  The Court does not find the Landlord's assertion

that the Debtor lacked a sinking fund has independent relevance in its recharacterization analysis.

This factor does not support recharacterization.

Conclusion as to Recharacterization

The Trustee and the Landlord each contend that application of the *AutoStyle* factors clearly

supports their respective position as to whether the Affiliate Claims are debt or equity.  *Compare*

Motion ¶ 53 ("Thus, all the factors for which there is information weigh heavily in favor of the

Affiliate Claims constituting debt.), *with* Objection at 24 ("In light of the above, every single factor other than subordination weighs in favor of recharacterization some or all of the [Affiliate Claims].")

The Affiliates reiterate that the Landlord has not met its burden of proof on the *AutoStyle* factors. Affiliate Reply ¶ 61. The Affiliates contend that there are only three factors for which the Landlord has any evidence to suggest that the loans were equity; however, all three of those factors are inconclusive based on the facts. *Id.* ("[T]he only three slightly equity leaning factors for which the Landlord has any evidence in support, are that some of the debts are unsecured—but most claims in bankruptcy cases are unsecured and trade debt is usually unsecured, that some of the debt did not have an interest aspect—but intercompany debt rarely does, and that the debts were payable on demand (and not first payable upon a sale)—which is a typical form of debt.").

In sum, the Court draws the following conclusions with respect to each *AutoStyle* factor:

1. The Trustee would have difficulty demonstrating that the documents which the Affiliates have produced are inconsistent with those that would evidence indebtedness. As for the remaining financing for which the Affiliates have not produced documentation, the Landlord has not demonstrated that the parties referred to that financing as something other than a loan. This factor does not support recharacterization.

2. There appears to have been no fixed maturity date, nor a schedule for repayments. These are typical features of debt, and since they are lacking here, this factor supports recharacterization except as to the Secured Revolving Credit Agreement.

3. Although some of the purported debt bore an interest rate, some of the debt did not. Except as to the Secured Revolving Credit Agreement and Secured Promissory Note, this factor supports recharacterization.

4. The Landlord has not demonstrated that the parties conditioned the Debtor's obligation to repay the alleged debt on its financial success. This factor does not support recharacterization.

5.  The Landlord contends, but has not demonstrated that the Debtor could not
    have begun its operations without financing by Milsom.  This factor does
    not support recharacterization.

6.  The Affiliates do not all have ownership interests in the Debtor, so the Court
    cannot measure the proportion of their financing of the Debtor relative to
    their equity investment in it.  Because this factor has no clear application in
    this circumstance, it does not support recharacterization.

7.  The fact that a portion of the financing is secured strongly suggests that that
    portion is debt rather than equity.  While securitization suggests that
    financing is debt, it does not follow that the absence of securitization is
    suggestive of equity.  The fact that other portions of the financing lack
    collateral does not suggest that those portions are more likely to be equity
    than debt.  This factor does not support recharacterization.

8.  It is unlikely that the Debtor could obtain its financing from a reasonable
    outside lender on any of the terms, or lack thereof, of the Affiliates'
    financing of the debtor.  This factor supports recharacterization.

9.  Nothing indicates that the financing offered by the Affiliates to the Debtor
    was subordinated to other creditors.  This factor does not support
    recharacterization.

10. The Landlord has not demonstrated that the Debtor used the financing to
    acquire capital assets.  This factor does not support recharacterization.

11. Though there is no evidence of a sinking fund, the Court does not consider
    this factor relevant in its recharacterization analysis.  This factor does not
    support recharacterization.

When deciding whether a purported debt should be recharacterized as equity, "[n]o

mechanistic scorecard suffices."  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys.*

*Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006).  Under the circumstances, the Court does not consider

any single factor overwhelmingly relevant in its recharacterization analysis.  Only the eighth

factors decidedly support recharacterization of the Affiliate Claim; the second and third factor

supports it partly.  Mindful of the Third Circuit's guidance, the Court considers the factors

holistically and in light of their purpose: to provide a framework to consider whether a purported

debt is more like debt or equity.  Though the Landlord would have some likelihood of success in asserting a recharacterization claim against the Affiliate Claims that were not documented, it is unlikely that such a claim would succeed against the Secured Revolving Credit Agreement and Secured Promissory Note.  The Court considers the import of this conclusion below.

<u>Conclusion as to Litigation's Possibility of Success and Settlement's Future Benefits</u>

As discussed, the Trustee would not likely succeed in challenging the Affiliate Claims on the basis of the sufficiency of its supporting documentation or on a statute-of-limitations theory, but it may be able to succeed on a recharacterization claim against at least some portions of the Affiliate Claims.  The Affiliate Claims are prima facie valid, and shifting the burden back to the Affiliates would be challenging.  Mindful that recharacterization is a closer question than the other two hypothetical challenges, the Court also considers that the Compromise will avoid the need for continued litigation, facilitate a faster distribution, and reduce the Affiliate Claims by 15%.  As it must, the Court weighs the likelihood of successfully objecting to the Affiliate Claims, particularly with respect to a recharacterization claim, together with the certain benefits provided by the Compromise, and finds that this factor supports approving the Compromise.

### *Factor 2: Costs and Risks Associated with Litigation*

The Trustee contends that, given the length of the proceedings, "the prospect of Affiliate Claims litigation remains an albatross for the Debtor."  Motion ¶ 71.  She submits that "[l]itigation would be contentious, drawn-out, and relatively costly, especially with the involvement of sophisticated and able counsel."  *Id.* ¶ 72.  The Affiliates assert that, absent approval of this Compromise, "the litigation that would ensue among the Landlord, the Affiliates and the estate would literally go on for years," given the Landlord's alleged aversion to settlement in the State Action and its "unfounded administrative claims against the Debtor's estate."  Affiliate Reply ¶ 66.

The Landlord argues that, were the Court to deny the Motion, there would be no "expense or inconvenience" to the Debtor or the Bankruptcy estate.  Objection at 25.  Essentially, the Landlord argues that any future litigation on the Affiliate Claims would be between only itself and the Affiliates on how to divide the funds of the estate, which would present no financial burden to the estate.  *Id.*  Moreover, it argues that denying this motion would not risk "overly complex or protected litigation," since the Landlord could quickly file an objection to the Affiliates' claims and seek recharacterization, which the Court could then address.  *Id.* at 25–26.  Moreover, the Landlord contends that no further discovery would be necessary to prosecute an objection to the Affiliate Claims.  *Id.*

The Court agrees with the Trustee and Affiliates that denial of the motion would inevitably prolong the already time-consuming and expensive litigation in this case.  The Landlord's representation that it would not need further discovery is somewhat self-defeating since, as explained above, the record evidence would not likely overcome the prima facie validity of the Affiliate Claims.  Moreover, the Landlord understates the complexity of and time necessary to resolve the sort of claim objections that it seeks to assert.  The Compromise that the Trustee has proposed would avoid these burdens, and accordingly, this factor weighs in favor of its approval.

### Factor 3: The Paramount Interests of the Creditors and the Creditors' Position with Respect to the Proposed Settlement

The Trustee asserts that the Affiliates, who collectively hold the largest claim against the estate, support the proposed Compromise "because it saves them the delay and expense of a long drawn out proceeding potentially involving discovery of records that are difficult to locate or that do not exist."  Motion at ¶ 73.  The Landlord maintains that, if the proposed Compromise were approved, the Landlord would receive an approximate $603,286.56 distribution, while the remaining non-Affiliate creditors would receive approximately $6,568.20, resulting in a

distribution of about 27.5 cents on the dollar—3.5 cents more than if the Affiliate Claims were allowed in full. *See id.* at 26–27.  It claims that this is below the range of reasonableness. *See id.* at 26–27 ("A 3.5% increase in the share of unsecured distributions is below the lowest point of reasonableness, with essentially no value whatsoever afforded to the Landlord and remaining unsecured creditors.").

The Affiliates argue that their claim is the largest claim and that a neutral party, who considers the interests of all creditors, has negotiated the Compromise.  Affiliate Reply ¶ 67.  The Affiliates argue that the Compromise will result in benefits to the estate in lowering the cost of the case and allowing for a faster distribution compared to continued litigation.  Affiliate Reply ¶ 67.

The benefits of the proposed Compromise to the general unsecured creditors and the Landlord are modest under the Compromise.  However, they gain added significance when measured against the benefits of a claim objection discounted by its likelihood of success.  Litigation will not only prejudice them through delay, but will likewise prejudice the Affiliates through the incurrence of further litigation expenses.  This factor weighs in favor of approving the Compromise.

### Factor 4: Whether Other Parties in Interest Support the Settlement

The Landlord argues that, as the largest non-insider creditor, the approval of the Compromise will affect its rights, and those rights must be considered by the Court.  *See* Objection at 27 (citing *In re Miami Metals I, Inc.*, 603 B.R. 531, 535 (Bankr. S.D.N.Y. 2019); *In re Ditech Holding Corp.*, 606 B.R. 544, 624–25 (Bankr. S.D.N.Y. 2019) (holding that the "Court must consider the fact that the Consumer Creditors Committee is not party to the settlement, and that it objects to it" in ultimately determining that a settlement should not be approved because it implicated the rights of a non-settling party)).  The Landlord contends that the Compromise will

drastically impair its right to challenge a claim of an insider and the result will be a dilution of his claim. *See id.*

The Trustee has the right to litigate claims that belong to the estate, and none of the Landlord's rights will be affected by the proposed Compromise. *Cf. In re Futterman*, No. 17-12899, 2019 WL 2553614, at *4 (Bankr. S.D.N.Y. June 20, 2019) ("[The debtor]'s rights are limited to the rights that a party in interest has to object to the wisdom of the Trustee's settlement decision under Rule 9019. If the rule were otherwise, then bankruptcy cases routinely would be stalemated. . . . The effect would be to turn over . . . the resolution of claims . . . to parties other than the trustee, which is exactly the opposite of what the Bankruptcy Code envisions."). The Court has considered the Landlord's positions on the proposed Compromise. There are very few other claimants, and those few other claimants hold claims disproportionately smaller than the Landlord's claim. Given the limited creditor body, this factor is inapposite to the Court's analysis.

### Factor 5: Competency and Experience of Counsel

The Trustee and the Affiliates are represented by skilled counsel, and the Landlord does not contend otherwise. Accordingly, this factor weighs in favor of approving the Compromise.

### Factor 6: The Nature and Breadth of Releases

The Compromise does not appear to encompass any releases, which weighs in favor of approving the Compromise.

### Factor 7: Arm's-Length Bargaining

The Trustee asserts that the proposed Compromise is the result of extensive discussions which were negotiated at arm's length "over the course of many weeks." Motion ¶ 75. The Landlord asserts that the settlement was negotiated through only "a couple of calls." Objection at 28–29 (citing Fitzpatrick Tr. at 159:14–160:2, 161:14–18). Furthermore, the Landlord argues that

the Motion offers only conclusory contentions that the settlement was reached by arm's-length negotiations. *Id.* at 28.

The Affiliates argue that the negotiations were conducted at arm's length. They claim that the negotiations began in the form of discussions between the Affiliates and the Landlord, consisting of a five-week email exchange between those two groups. Affiliate Reply ¶ 72. The Affiliates say that after the Landlord and the Affiliates reached an impasse, the Affiliates began negotiating with the Trustee; each side proposed different percentage reductions to the Affiliate Claims before both agreed to the 15% claim reduction as contemplated by the Compromise. Affiliate Reply ¶ 72.

It is apparent that after the Landlord and the Affiliates were unable to reach a settlement, the Trustee and the Affiliates bargained at arm's length for a compromise. The Court sees nothing to imply that the negotiations were perfunctory or collusive. This factor weighs in favor of approving the Compromise.

### Conclusion

Based on the foregoing, the Court grants the Motion in its entirety.

IT IS SO ORDERED.


Dated: New York, New York
       January 12, 2024

                                        /s/ *James L. Garrity, Jr.*
                                        Hon. James L. Garrity, Jr.
                                        U.S. Bankruptcy Judge